**Clifford JUDD, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 1197.**

Supreme Court of Alaska.

March 11, 1971.

Floyd V. Smith, Anchorage, for appellant.

G. Kent Edwards, Atty. Gen., Juneau, Harold W. Tobey, Dist. Atty., Robert L. Eastaugh, Asst. Dist. Atty., Anchorage, for appellee.

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR and ERWIN, JJ.

## OPINION

ERWIN, Justice.

Appellant was convicted of possession of heroin as a result of an arrest and search on December 26, 1967, of the apartment which he occupied. He contends that the search violated Chimel v. California, 395

U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and Fresneda v. State, 458 P.2d 134 (Alaska 1969), because it was a general search of the entire apartment without a search warrant.

The facts show that on December 6, 1967, a quantity of narcotics was found in some clothing which had been turned over to an Anchorage cleaning establishment. The clothing belonged to the appellant, Clifford Judd. As a result, on December 21 a warrant for Judd's arrest was obtained by the City Police. Due first to the illness of Detective Gray, the officer charged with the execution of the warrant, and then to the intervention of the Christmas holiday, the warrant was not served until Tuesday, December 26.

On that date Detective Gray, having first driven past Judd's apartment and observed that his car was there, enlisted the aid of Detectives Weaver, Moerlins, and James to assist him in serving the warrant. They arrived outside Judd's apartment at approximately 11:00 a. m. They knocked on the door, identified themselves and, receiving no answer, forced the door. They found the apartment occupied by Judd, Mrs. Judd and a man named McClain. As Officer Gray entered, Judd turned and ran back through the dining area of the apartment, with Gray in hot pursuit. The arrest was actually made in the kitchen. During the search which followed Judd was not physically restrained, although he was instructed to sit down in a chair. He was permitted to call an attorney, who arrived about 10 minutes later.

At the time the arrest was made, there were a number of items in plain sight in the apartment which constituted evidence of the use of narcotics. For example, two plastic hypodermic syringes were found on the kitchen floor, and six discolored toothpicks could be seen behind the refrigerator. Several bent spoons containing a burnt residue were visible in the kitchen, and a bottle of isopropyl alcohol stood on the dining room table, together with a hypodermic and a knotted nylon stocking. These items, together with others, were admitted into evidence against Judd. Heroin, and sometimes morphine, were detected by chemical tests on some of them including the spoons and toothpicks. However, no measurable or usable quantity of any narcotic was found in any of the items which were in plain view at the time of the arrest.

Having picked up the evidence that was in plain view, the officers continued to search. Paper bags and boxes were opened, garbage sacks dumped, kitchen cabinets opened and their contents examined, etc. Opening one of the cabinets Officer Moerlins discovered, concealed among jars of other spices, a jar labeled "Jamaica Allspice." Inside the jar he found a plastic packet containing a brownish powder. Upon chemical analysis, the contents of the plastic bag proved to be 12.4 grams of a substance containing 17.4% pure heroin, together with some morphine.

On January 22, 1968, Judd was indicted on two counts of possession of narcotics, the first involving the narcotics found in the laundry and the second those found in his apartment at the time of his arrest. On April 2, 1968, that case was dismissed on ex parte motion of the District Attorney. On January 21, 1969, the indictment in the present case was returned on the same two charges. Count I having been dismissed by the State, Judd was first brought to trial on Count II in April of 1969. After an extensive evidentiary hearing, Judd's motion to suppress evidence was denied by the trial court. On April 16, 1969, the court granted a mistrial after it was discovered that the police file on the case had been lost, and that the file contained a letter, a telegram and a report which the court had ordered the state to produce for use in the cross-examination of FBI Agent Yates, the prosecution's expert witness.

Beginning on the 7th or 8th of July, 1969, the case was retried. Most of the items found in Judd's apartment were again admitted into evidence, including the packet of heroin found in the Allspice bottle. A

conviction resulted, and this appeal followed.

The initial question before this court is whether or not the decision in *Fresneda* applying *Chimel*, which was announced before this case was appealed, should be applied herein. This case was appealed on September 30, 1969, from the judgment entered on the 26th day of September, 1969, and thus was still pending at the trial stage during the time that *Fresneda* was announced. In footnote 28 on page 143 of *Fresneda* the Court indicated that it would apply the *Chimel* rule to cases pending on direct review on the date of the *Chimel* decision of June 23, 1969, but did not rule on the retroactive effect prior to that time.

The state urges that *Chimel-Fresneda* not be given retroactive effect and apparently urges that this court adopt the rule announced in Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), and apply a federal standard of retroactivity to the case at bar and future cases of changes in the law. Appellant urges reversal on the basis of *Chimel*.

■ Initially, it should be realized that the case of Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) stands for the proposition that there is no constitutional requirement of retroactive application of decisions; the Court is free to announce a decision as retroactive or prospective. The Supreme Court of the United States, since this first landmark decision, has in the majority of cases refused to give any retroactive effect to its decisions. The court started in *Linkletter* by specifically holding that the decision in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) that illegally seized evidence was not admissible in state prosecutions should not be applied retroactively. In Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), the court held that its decision in Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) that it violates the privilege against self-incrimination for

the prosecution or the trial judge to comment on a criminal defendant's failure to testify in his defense, should not apply "retroactively." Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), held that Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) should not apply "retroactively." Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) held that United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed. 2d 1178 (1967), both of which related to the right to counsel at a pretrial lineup, should not be applied "retroactively." In DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968), the court held that the right to trial by jury in state criminal prosecutions that had been established in Duncan , v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), and Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968) was not "retroactive." Finally, the court held in Fuller v. Alaska, 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212 (1968), that Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968) was not "retroactive." *Lee* ruled that evidence obtained in violation of § 605 of the Federal Communications Act of 1934 was not admissible in state criminal proceedings.

Unfortunately, the meaning of "prospectivity" or "non-retroactivity" has varied in the Supreme Court's decisions, and therein lies a distinct problem for the Supreme Court of Alaska in attempting to adopt any federal precedent. In Linkletter v. Walker, *supra,* and Tehan v. United States ex rel. Shott, *supra, Mapp* and *Griffin* were said not to apply to convictions that had become final prior to the announcement of those decisions, but they indicated that *Mapp* and *Griffin* might apply also to cases pending on direct review at the time of those decisions. Johnson v. New Jersey, *supra,* by

contrast, held *Miranda* and *Escobedo* applicable only to trials begun after *Miranda* and *Escobedo* were announced. Stovall v. Denno, *supra,* held that the *Wade* and *Gilbert* decisions should apply only to cases in which the illegal official conduct took place after the date of decision. DeStefano v. Woods, *supra,* held that *Duncan* and *Bloom* should apply only to cases where the trial commenced after the date of decisions, a date which, since these cases involve the right to a jury trial, was apt to coincide with the date of the official conduct. Fuller v. Alaska, *supra,* held that Lee v. Florida, *supra,* would apply only in cases in which the illegally obtained evidence was introduced after the date of the decision. In all of these cases the new rule was applied also in the case in which it was announced.

The state authorities are apparently in accord with the federal view of retroactivity, but they do not have as much of a problem with the date of prospective applications as does the United States Supreme Court.[1]

At common law there was no authority for the proposition that a judicial decision made law only for the future.[2] Blackstone stated the rule that the duty of the court was not to "pronounce a new law, but to maintain and expound the old one,"[3] and that the judge rather than being the creator of the law was but its discoverer.[4] The overruled decision was thought to be only a failure at true discovery and was consequently never the law, while the overruling one was not "new law" but an application of what was and therefore had always been the true law.[5]

The Blackstonian view ruled English jurisprudence and cast its shadow over American development as well.[6] However, some legal philosophers, led by Benjamin Cardozo, continued to insist that such a rule was out of tune with actuality largely because judicial "repeal" of an existing rule often worked hardship to those who had trusted to its existence.[7]

The contrary view gradually gained acceptance in the United States Supreme Court[8] after Cardozo became an associate justice. The court adopted the view that if justifiable reliance had been placed upon an earlier judicial decision by those persons affected by it, the courts were required to consider this factor in determining whether subsequent changes in the law would be retroactive.

■ The criteria guiding resolution of the question of retroactivity which apparently have been agreed upon by all au-

1. *See* State v. Reyes, 81 N.M. 404, 467 P.2d 730, 732 (1970) ; Thornton v. State, 451 S.W.2d 898, 902 (Tex.Cr.App.1970) ; State v. Herrera, 19 Mich.App. 216, 172 N.W.2d 529, 537 (1969) ; People v. Edwards, 71 Cal.2d 1096, 80 Cal.Rptr. 633, 458 P.2d 713, 720 (1969) ; Scott v. State, 7 Md.App. 505, 256 A.2d 384, 389–392 (1969).

2. Kuhn v. Fairmont Coal Co., 215 U.S. 349, 372, 30 S.Ct. 140, 54 L.Ed. 228, 239 (1910) (Dissenting Opinion of Justice Holmes).

3. 1 Blackstone, Commentary 69 (15th Ed. 1809) ; also, Grey, Nature and Sources of the Law, 206 (1st Ed. 1909).

4. Grey, Nature and Sources of the Law 222 (1st Ed. 1909).

5. Linkletter v. Walker, 381 U.S. 618, 622–623, 85 S.Ct. 1731, 14 L.Ed.2d 601, 604–605 (1965).

6. *See* Norton v. Shelby County, 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178 (1886).

7. B. Cardozo, Address to the New York Bar Ass'n in Selected Writings of Benjamin Nathan Cardozo 7, 34–37 (1947 ed. repr. 1967) ; Shaefer, The Control of "Sunbursts": Techniques of Prospective Overruling, 42 N.Y.U.L.Rev. 631, 632–34 (1967).

8. *See* Gelpcke v. Dubuque, 68 U.S. (1 Wall.) 175, 17 L.Ed. 520 (1864) ; Kuhn v. Fairmont Coal Co., 215 U.S. 349, 30 S.Ct. 140, 356–359, 54 L.Ed. 228, 232–233 (1910) ; Great Northern R. R. Co. v. Sunburst Oil & Refinery Co., 287 U.S. 358, 363–364, 53 S.Ct. 145, 77 L.Ed. 360, 366 (1932) (Cardozo, J.) ; Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 374–376, 60 S.Ct. 317, 84 L.Ed. 329, 332–333 (1940).

thorities are as follows: (a) the purpose to be served by the new standards; (b) the extent of the reliance by law enforcement authorities on the old standards; and (c) the effect on the administration of justice of a retroactive application of the new standards.[9]

In the case of Gray v. State, 463 P.2d 897, 913 (Alaska 1970), this court recognized two of the criteria generally accepted by legal writers in discussing retroactive activity, but did not discuss the third which was reliance by those responsible for enforcement of the standards as announced by judicial decision. This factor was not necessary in the discussion of *Gray,* but we wish to make clear at this time that reliance by those who must enforce the judicial decision is an appropriate additional consideration to be considered in determining problems of retroactivity. All three criteria will be referred to in the future in balancing the varied interests necessary.

Since without question a value judgment is involved little can be added to the arguments presented in the cases except to say that once one realizes that any decision will involve an arbitrary classification which is not particularly defensible except in terms of its impact, then one has arrived at a starting point for making the necessary policy decisions.

It further should be realized that the court is aware that in certain circumstances a decision against retroactivity could lead to uneven results so far as the admission or exclusion of evidence is concerned, so that in a particular case the court may appear to countenance illegal acts on the behalf of the police. In such circumstances, there is an undeniable appeal to the Blackstonian view so ably expressed by Justice Peters of the California Supreme Court in his dissent in People v. Edwards, 71 Cal.2d 1096, 80 Cal.Rptr. 633, 643, 458 P.2d 713, 723 (1969) that it appears grossly unfair for the court to take a hand in the securing of convictions by the use of unlawfully obtained evidence:

Both of the fundamental policies reflected by *Cahan* [People v. Cahan, 44 Cal.2d 434, 282 P.2d 905] and *Mapp* are frustrated by the rule of prospective application adopted by the majority. The immediate result of the refusal to apply *Chimel* to pending cases means that the appellate and trial courts of this state will have a hand in the 'dirty business' of securing convictions by the use of unlawfully obtained evidence. In these days, when so many people have taken to the streets in attack upon our institutions and in defiance of the fundamental concepts of ordered liberty, it is more than ever necessary that a court out of regard for its own dignity as an agency of justice and custodian of liberty strive to maintain that dignity, vindicate constitutional rights, and encourage respect for a system of justice which does not sacrifice constitutional rights for expediency. Yet we are told today that a trial court may convict Mr. Edwards and others on the basis of evidence seized in violation of constitutional rights and, if so, appellate courts may affirm that conviction. Such a decision lends no dignity to our court system and does not encourage respect for our institutions or our law.

The logic of these ideals is not disputed but this approach must be balanced against the practical problems arising from the undisputed fact that the police, prosecuting agencies and the public have relied upon the previous statements of the law, and that the great impact of and respect for the law in our society is based on such acceptance by the public generally. A change for the future can be digested but the application of a new interpretation to past conduct which was accepted by previous judicial decisions leads us to confusion and a hesitancy to accept any theory except one of gamesmanship with correspond-

9. Linkletter v. Walker, 381 U.S. 618, 636–638, 85 S.Ct. 1731, 14 L.Ed.2d 601, 612–613 (1965).

ing disrespect for our whole system of laws.[10]

There is little question that this search would have been sanctioned by the Supreme Court of the United States under the law as it stood before *Chimel*,[11] and thus the burden of decision is placed directly upon this court. While there is some comfort in the fact that the law review writers have the same problem that we have,[12] there is no escape from the ultimate decision.

◼ It is the decision of this court that the rule of *Chimel* and *Fresneda* shall apply to all police searches taking place after the date of the *Chimel* opinion of June 23, 1969. In this way, this court will continue its necessary control over the activities of all police agencies in this state to guarantee to all citizens those basic rights protected by the United States and Alaska Constitutions; but we will not be placed in the position of now declaring invalid searches which were performed in good faith reliance upon prior decisions of the United States Supreme Court.

◼ Since the search in this case took place on December 26, 1967 and was permissible under previous decision, we rule that it was not error for the trial court to admit into evidence the contents of the "Jamaica Allspice" bottle which contained 12.4 grams of a substance containing 17.4% heroin.[13]

Appellant has also argued that his conviction would be improper unless the state proved that a usable quantity of heroin was found in his possession. While it is obvious that 12.4 grams of 17.4% heroin was a usable quantity of drugs, we deem it appropriate at this time to hold that under the facts of this case there was sufficient evidence of unlawful possession of heroin without introduction into evidence of the contents of the allspice bottle.[14]

10. It is recognized that the initial battleground over retroactive versus prospective application was on the basis of encroaching federalism. *See* Haddad, "Retroactivity Should be Rethought": A Call for the End of the Linkletter Doctrine, 60 J.Crim.L., C. & P. S. 417, 420–25 (1969). But this battle has long since been decided and little purpose can be served by attempting to resurrect it at this point. Particularly appropriate in today's world is the following:

Considerations of federalism of course remain important. But in the world today they must be measured against the competing demands arising out of the relation of the United States to the rest of the world. The quality of a nation's civilization can be largely measured by the methods it uses in the enforcement of its criminal law. That measurement is not taken merely in retrospect by social historians of the future. It is taken from day to day by the peoples of the world, and to them the criminal procedure sanctioned by any of our states is the procedure sanctioned by the United States.

Schaefer, Federalism and State Criminal Procedure, 70 Harv.L.Rev. 1, 26 (1956).

11. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947).

12. *See*, Schwartz, Retroactivity, Reliability, and Due Process: A Reply to Professor Mishkin, 33 U.Chi.L.Rev. 719 (1966); Comment, Prospective Overruling and Retroactivity: Application in the Federal Courts, 71 Yale L.J. 907 (1962); Comment, Linkletter, Shott, and the Retroactivity Problem in Escobedo, 64 Mich. L.Rev. 832 (1966); Bender, The Retroactive Effect of an Overruling Constitutional Decision: Mapp v. Ohio, 110 U.Pa.L.Rev. 650 (1962); Currier, Time and Change in Judge-Made Law: Prospective Overruling, 51 Va.L.Rev. 201 (1965); Comment, The Supreme Court 1964 Term, 79 Harv.L.Rev. 56; Schaefer, The Control of "Sunbursts": Techniques of Prospective Overruling, 42 N.Y.U.L. Rev. 631 (1967).

13. This decision is consistent with our previous decisions in Gray v. State, 463 P.2d (Alaska 1970); Fresneda v. State, 458 P.2d 134, 897, 912–913, 143, n. 28 (Alaska 1969); and Salinas v. State, 373 P.2d 512, 516 (Alaska 1963) and gives this court the necessary flexibility to deal with problems in this area.

14. In this case appellant was initially charged with unlawful possession of heroin as a result of finding a quantity of heroin in the pocket of his suit by the cleaning establishment where the suit was taken to be cleaned.

At the time the police officers served the warrant for his arrest, the appellant refused to answer the door of his apart-

We find that the purpose of the Alaska Narcotic Drug Act is to deter improper traffic in narcotic drugs by making it illegal to knowingly possess certain drugs.[15] Where the facts of a case show knowing possession of illegal drugs, it is unnecessary that a usable quantity be found so long as a sufficient quantity of the drug is found to permit proper identification. If all of the evidence in the case, taken together, supports the jury's findings of knowing possession beyond a reasonable doubt, the conviction is proper.

Appellant also contends that his second trial, which was held after a mistrial was granted in his first trial at his request because of claimed errors committed by the prosecution, was unlawful because it placed him twice in jeopardy for the same offense. However, this same question in a remarkably similar fact situation has been decided adversely to appellant in the recent opinion of this court in Muller & French v. State,[16] and thus no further discussion of the problem is necessary herein.

Appellant's final contention is that he was denied his right to speedy trial under the case of Glasgow v. State,[17] and the indictment herein should have been dismissed with prejudice. Appellant however, did not raise this point in the trial court nor in his statement of points on appeal. His rather cursory treatment of this issue in his opening and reply briefs further convinces us that appellant tendered this issue as an afterthought and under these circumstances we decline to consider it[18] other than to note that under the decision of this court in *Glasgow* there appears to have been no plain error which might otherwise lead us to intervene.[19]

The judgment of conviction is affirmed.

RABINOWITZ, Justice (concurring).

I have geminous reservations as to whether this court possesses the authority to decree, or as a matter of policy should hold, that a constitutional decision in a criminal case need not be given retroactive application. It is difficult to perceive how adoption of a prospective only technique can be

---

ment and the police officers had to force open the door after identifying themselves. When they arrived inside they apprehended appellant, who was seen running toward the kitchen, near the stove which had one burner red hot. A quantity of liquid was observed near the burner on the stove and counter and two hypodermic syringes with needles attached were on the floor near the base of the stove.

Two bent spoons containing a burnt residue were four to five inches from the burner and a small pan also containing a burnt residue was in the sink. Used cotton balls and toothpicks were observed on the kitchen floor while a bottle of isopropyl alcohol, together with a silk stocking with a slip knot in it and another syringe, were standing on the dining room table adjacent to the kitchen. The hypodermic needle contained a dark red substance similar to blood on the tip, suggestive of recent use.

Laboratory analysis of the items found confirmed traces of morphine and heroin in the hypodermic syringes, cotton balls, toothpicks, spoons, small pan and the liquid removed from the stove.

15. Frasher v. State, 8 Md.App. 439, 260 A.2d 656, 661 (1970); State v. Dodd, 28 Wis.2d 643, 137 N.W.2d 465 (1965); State v. Jefferson, 391 S.W.2d 885, 890 (Mo.1965); State v. Winters, 16 Utah 2d 139, 396 P.2d 872, 875 (1964). *See* People v. Sullivan, 234 Cal.App.2d 562, 44 Cal.Rptr. 524, 526–530 (1965) (Herndon, J. concurring). *Contra:* Edelin v. United States, 227 A.2d 395, 397–398 (D.C.Mun. Ct.App.1967); State v. Moreno, 92 Ariz. 116, 374 P.2d 872 (1962); Pelham v. State, 298 S.W.2d 171, 173 (Tex.Civ.App. 1957).

16. 478 P.2d 822 (Alaska 1971).

17. 469 P.2d 682 (Alaska 1970).

18. Alaska Sup.Ct.R. 9(e), 11(a) (6). Appellant has not filed a specification of errors in his brief noting where in the record that the presentation of such an issue in the trial court occurred. We decline to search the voluminous record for such an issue.

19. See Alaska R.Crim.P. 47(b). DeSacia v. State, 469 P.2d 369 (Alaska 1970); Pulakis v. State, 476 P.2d 474 (Alaska 1970).

squared with Alaska's constitutional declaration, found in article I, section 1, "that all persons are equal and entitled to equal rights, opportunities, and protection under the law. * * *" The Draconian characteristics of prospective application of adjudications in the area of individual constitutional rights in criminal cases is sharply illuminated in the case at bar.

But for the government's loss of an important file which it was ordered to produce at appellant Judd's first trial in April 1969, in all probability Judd's appeal would have been pending at the time the Supreme Court of the United States rendered its decision in *Chimel*.[1] In *Fresneda* we held *Chimel* applicable to all cases pending on direct review in this court as of the date of the *Chimel* decision.[2] In all fairness to appellant, I think *Chimel* should govern the disputed search and seizure in this case. For here it was the government's dereliction which triggered the trial court's declaration of a mistrial at appellant's first trial. Although I concur in the court's holding that under *Muller* reprosecution of Judd was

not violative of either Alaska's or the Constitution of the United States' proscriptions against double jeopardy, I believe it unfair to place appellant beyond the protective emanations of *Chimel* where the state's own actions fortuitously prevented appellant's case from attaining pending-on-appeal-status at the time *Chimel* was decided.[3]

I find I am also in disagreement with a further facet of the court's opinion. The validity of the search and seizure issue appears to have been decided as if section 14 of article I of the Alaska Constitution was nonexistent.[4] Seemingly overlooked are Roberts v. State, 458 P.2d 340, 342 (Alaska 1969); Glasgow v. State, 469 P.2d 682, 686 (Alaska 1970); and Baker v. City of Fairbanks, 471 P.2d 386, 401–402 (Alaska 1970). These decisions explained this court's duties regarding interpretations of Alaska's Constitutional provisions. In *Roberts*, we said:

> We are not bound in expounding the Alaska Constitution's Declaration of Rights by the decisions of the United

1. Prior to the commencement of his first trial, Judd moved to suppress the contents of the allspice bottle. After conducting a lengthy suppression hearing, the trial court denied Judd's motion.

2. Fresneda v. State, 458 P.2d 134, 143 n. 28 (Alaska 1969). *Fresneda* is this court's only decision concerning the subject of retroactivity involving constitutional rights in criminal cases. In Gray v. State, 463 P.2d 897, 913 (Alaska 1970), prospective application was given to our decision in Speidel v. State, 460 P.2d 77, 84 n. 27 (Alaska 1969), regarding the right of an accused to be present at presentence conferences. Our decision in Speidel was based on non-constitutional grounds.

3. It appears that the court's rationale for its refusal to accord *Chimel* full retroactive application possibly signals a resurrection of expediency oriented decision making, a technique which was emphatically rejected in Baker v. City of Fairbanks, 471 P.2d 386, 394 (Alaska 1970). There the applicability of Alaska's constitutional provision guaranteeing jury trials to misdemeanor cases was considered against the potential costs of governmental implementation. In *Baker*, we said:

> The argument from expediency contains inherent defects. If an individual right is vested by the Constitution, the overriding demands of governmental efficiency must be of a compelling nature and must be identifiable as flowing from some enumerated constitutional power. To allow expediency to be the basic principle would place the individual constitutional right in a secondary position, to be effectuated only if it accorded with expediency.
>
> This would negate our entire theory of constitutional government. The American constitutional theory is that constitutions are a restraining force against the abuse of governmental power, not that individual rights are a matter of governmental sufferance. (footnote omitted).

4. Art. I, § 14 of the Alaska Const. reads:
> The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

States Supreme Court, past or future, which expound identical or closely similar provisions of the United States Constitution.

In the *Baker* case, we reiterated the position taken in *Roberts,* and further stated:

> While we must enforce the minimum constitutional standards imposed upon us by the United States Supreme Court's interpretation of the Fourteenth Amendment, we are free, and we are under a duty, to develop additional constitutional rights and privileges under our Alaska Constitution if we find such fundamental rights and privileges to be within the intention and spirit of our local constitutional language and to be necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage. We need not stand by idly and passively, waiting for constitutional direction from the highest court of the land.
>
> Instead, we should be moving concurrently to develop and expound the principles embedded in our constitutional law. (footnotes omitted).

Fresneda v. State, 458 P.2d 134, 138–143 (Alaska 1969), contains both a clear exposition of the historical struggle which gave birth to the Fourth Amendment as well as a cogent explanation as to why adherence to the constructive possession rationale of Harris v. United States, 331 U.S. 145, 67 S. Ct. 1098, 91 L.Ed. 1399 (1947), and to United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), would result in virtual repeals of the Fourth Amendment and article I, section 14 of the Alaska Constitution.[5] Here the police acting without a search warrant, conducted an extensive and prolonged search of three rooms of appellant's apartment in conjunction with their arrest of appellant. Guided by the teachings of *Baker, Roberts* and *Fresneda's* analyses of the constitutional protections against unreasonable searches and seizures, I conclude that the overbroad, intensive search which led to the seizure of the contents of the allspice bottle exceeded the permissible bounds of a warrantless search under article I, section 14 of the Alaska Constitution. The happenstance that a large number of items of narcotics paraphernalia were in plain view cannot furnish legal justification for the duration and scope of the intensive warrantless search which was conducted. Here the arresting officers had ample probable cause to obtain a search warrant and could have, without difficulty, secured the premises in the interim.

Despite the foregoing, I find I can concur in the result reached by the court. Assuming the applicability of *Chimel* or the invalidity of the search and seizure of the allspice bottle under Alaska's Constitution, or both, the police properly seized numerous other items of narcotics paraphernalia which were strewn about appellant's apartment in plain view. Many of these items were found to contain traces of heroin. Such evidence, in my view, afforded a solid evidentiary basis for the jury's determination that appellant knowingly possessed heroin. Study of the entire record has left me with the conviction that introduction of the allspice bottle's contents into evidence was harmless error under both Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705, 710–711 (1967), as modified by Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) and the harmless error test this court articulated in Love v.

5. Assuming reliance to be the controlling criterion regarding prospective or retroactive application of constitutional adjudications of search and seizure questions, there were no decisions of this court at the time the questioned search took place which sanctioned a search as broad as the one carried out in the case at bar. *See* Weltz v. State, 431 P.2d 502 (Alaska 1967); Merrill v. State, 423 P.2d 686 (Alaska 1967); Goss v. State, 390 P.2d 220 (Alaska 1964); Ellison v. State, 383 P.2d 716 (Alaska 1963); Brown v. State, 372 P.2d 785 (Alaska 1962). *Compare* Knudsen v. City of Anchorage, 358 P.2d 375, 379 (Alaska 1960).

State, 457 P.2d 622, 634 (Alaska 1969) more particularly "that the error did not appreciably affect the jury's verdict." [6]

In reaching this conclusion, I am persuaded that under Alaska's Narcotic Drug Act it is not necessary that the prosecution prove that a measurable or useable quantity was found in order to obtain conviction for unlawful possession of a particular drug. This is not to say that possession of an unuseable trace, or residual debris, in and

of itself is sufficient to warrant conviction. The quantity of narcotics found is relevant circumstantial evidence, however, the totality of the evidence must be such as to show beyond a reasonable doubt, a knowing possession of a useable quantity of a prohibited drug. See Justice Herndon's concurring opinion in People v. Sullivan, 234 Cal.App. 2d 562, 44 Cal.Rptr. 524, 526–530 (1965).

I concur with the court's disposition of all other issues in this appeal.

[6]. Swaim, Alaska's Criminal Harmless—Error Rule: Love v. State, 457 P.2d 622

(August 8, 1969), 8 Alaska Law Journal 215 (1970).