**James ALDRIDGE, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. 3413.

Supreme Court of Alaska.

Nov. 23, 1979.

Robert Coats and Mary E. Greene, Asst. Public Defenders, Fairbanks, Brian C. Shortell, Public Defender, Anchorage, for appellant.

Thomas Jahnke and David C. Stewart, Asst. Dist. Attys., Harry L. Davis, Dist. Atty., Fairbanks, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

RABINOWITZ, Chief Justice.

Aldridge was found guilty of the crime of possession of heroin, while he was an inmate of the Fairbanks Correctional Center, in violation of AS 17.10.010.[1] In this appeal, Aldridge advances two specifications of error. First, it is claimed that the conviction should be set aside, and the case remanded with directions to dismiss the charge, because Aldridge was denied the right to a speedy trial under Alaska Criminal Rule 45. Aldridge further asserts that he is entitled to a new trial because the superior court incorrectly instructed the jury as to the elements of the offense. We will first address the speedy trial issue.

Criminal Rule 45(b), in setting out speedy trial time limits, provides that an accused shall be tried within 120 days from the time set forth in section (c)(1) of Rule 45. This section provides, in part:

The time for trial shall begin running, without demand by the defendant, as follows:

(1) From the date the defendant is arrested, initially arraigned, or from the date the charge (complaint, indictment, or information) is served upon the defendant, whichever is first. . . .[2]

The relevant facts pertaining to this issue are as follows:[3] On June 28, 1976, Roy Whitesitt, a correctional officer at the Fairbanks Correctional Center, was making a "head count" of inmates in the dormitories. As he entered the defendant's dorm, he saw defendant and another inmate shove something behind them; Whitesitt left the dorm, but continued to watch the defendant through a window. He observed Aldridge

1. Aldridge was sentenced to a term of ten years with nine years suspended. The sentence was made to run consecutively to the sentence Aldridge was serving at the time the present offense occurred.

2. Alaska R.Crim.P. 45(g) provides for an absolute discharge:

   If a defendant is not brought to trial before the running of the time for trial, as extended by excluded periods, the court upon motion of the defendant shall dismiss the charge with prejudice. Such discharge bars prosecution for the offense charged and for any lesser included offense within the offense charged.

3. Aldridge's version of the facts contradicts Whitesitt's account as to what transpired in the dorm prior to Whitesitt's entry. However, it is the undisputed events which occurred after Whitesitt entered the dorm the second time that are critical to our holding.

hold a spoon over a book of burning matches, and then stretch out his arm and pick up what Whitesitt thought was a syringe. Officer Whitesitt then re-entered the dorm and ordered Aldridge and another inmate, Ernest Tyler, to stand up and away from the bench where Aldridge had been seated. Aldridge then headed for the bathroom, though ordered to stop by Whitesitt, and flushed some items down the toilet. Officer Whitesitt searched the dorm's bed and found a moist balloon, a blackened spoon with a piece of moist cotton in it, a cotton swab, and a little packet of pills, which he seized. Whitesitt next took the seized items into an office where they were locked up.

Shortly after these events, Aldridge and the other inmate were removed from the dorm to the maximum security unit. Approximately fifteen minutes after he had been placed in the maximum security unit, Aldridge was subjected to a body search by correctional personnel. Some seven hours later, an Alaska State Trooper arrived at the jail and questioned Aldridge after advising him of his rights. The Alaska State Trooper then went to the district attorney's office to obtain a search warrant for blood and urine samples. The search warrant was subsequently served and photographs taken of Aldridge's arm. Blood and urine samples were obtained and forwarded to the Alaska State Trooper crime laboratory in Anchorage. The laboratory reports indicated the presence of morphine or its derivatives in Aldridge's urine.[4]

On August 12, 1976, Aldridge was indicted for the crime of possession of heroin under AS 17.10.010. Trial commenced on December 7, 1976, 132 days after the incident at the jail and 87 days after the return of the indictment.

The narrow issue presented is when the statutory 120-day speedy trial period commences to run under the particular factual circumstances of this case where Aldridge was accused of committing a crime while in custody on unrelated charges. Aldridge takes the position that the actions taken by the state troopers and prison authorities on June 28, 1976, the day of the incident, constituted an arrest and placed him in a position which warrants the protection of the speedy trial rule.[5] In denying Aldridge's motion for dismissal of the charge, the superior court reasoned that Criminal Rule 45 was not violated because Aldridge had not been arrested, and thus the 120-day period commenced with the return of the indictment.[6]

In *United States v. Clardy*, 540 F.2d 439 (9th Cir.), *cert. denied*, 429 U.S. 963, 97 S.Ct. 391, 50 L.Ed.2d 331 (1976), the court addressed the denial of a speedy trial claim made under the sixth amendment in the context of an offense committed by inmates upon a fellow inmate. In part, the Ninth Circuit reasoned:

> Both appellants contend that the failure to commence trial sooner deprived them of their speedy trial rights under

---

**4.** Aldridge testified that he was taking Tylenol Number 3, a prescription drug. The crime lab's chemist testified that Tylenol Number 3 would produce a positive test of morphine derivatives.

**5.** In support of his argument that an arrest occurred on June 28, Aldridge points to the following factors:

Aldridge and Tyler were immediately taken from their dormitory and placed in the maximum security unit. They were body searched, and Alaska state troopers were called in. A search warrant was obtained, and blood and urine samples were taken from Aldridge and Tyler and sent to the trooper lab for analysis. Photographs were taken of Aldridge's and Tyler's arms, and a trooper initialed and dated the tangible evidence and transferred it to the trooper's evi-

dence locker. A trooper advised Aldridge and Tyler of their rights, and interviewed them.

Aldridge and Tyler were indicted on August 12, 1976.

**6.** This ruling was made by Judge Blair. In his decision on the motion to dismiss, Judge Blair reasoned, in part:

The guard had the authority and responsibility to enforce jail regulations and to prevent the use of controlled substances and to institute disciplinary measures (maximum security confinement) for violations. The jailer's actions do not constitute an arrest merely because there was subsequent prosecution for the offense.

the Sixth Amendment. That right assertedly attached when appellants were *de facto* arrested by being placed in segregated confinement after the attack. However, such discipline is not an 'arrest' for speedy trial purposes. Cf. *United States v. Smith,* 464 F.2d 194 (10th Cir.), *cert. denied,* 409 U.S. 1066, 93 S.Ct. 566, 34 L.Ed.2d 519 (1972). The identifying indicia of a *de facto* arrest sketched in *United States v. Marion,* 404 U.S. 307, at 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), are for the most part absent here. The prison discipline did not focus public obloquy upon appellants, did not disrupt their 'employment' or drain appellants' financial resources. In short, it was not a public act with public ramifications, but a private act. Actual physical restraint may have increased and free association diminished, but unless we were to say that imprisonment *ipso facto* is a continuing arrest, these criteria bear little weight in the peculiar context of a penal institution where the curtailment of liberty is the general rule not the exception. Thus, speedy trial rights did not come into play until April 1, 1975, when appellants were indicted, and therefore, for purposes of such rights, the delay was only two months and 28 days. During this period, appellants' rights were not infringed. The delay was relatively brief and was not employed by the Government to harass. During that period, several motions had to be considered and decided. We do not say that appellants'

status as prisoners automatically precluded assertion of the claim presently *sub judice, see Strunk v. United States,* 412 U.S. 434, at 439, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973); *Smith v. Hooey,* 393 U.S. 374, at 379, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), but that based upon all the facts and circumstances, their speedy trial claims are unpersuasive.[7]

We think the analysis and reasoning employed by the *Clardy* court is persuasive and applicable to the case at bar. Aldridge's removal from the prison dormitory and placement in a maximum security unit by institutional personnel did not constitute an arrest either with regard to the *Marion*[8] criteria or under Alaska's statutes.[9] Nor are we persuaded that the actions of the troopers constituted an arrest of Aldridge for purposes of Criminal Rule 45.[10] We therefore conclude that Aldridge's right to a speedy trial under Criminal Rule 45 was not violated, since he was tried within 87 days of the return of the indictment in his case.

█ The provisions of Criminal Rule 45 are not focused on the special circumstance where the accused is already incarcerated at the time the alleged offense occurs, and it is difficult to apply the concept of arrest for purposes of speedy trial guarantees to that situation. Thus, we think our Advisory Committee on Criminal Rules should consider a possible amendment to Rule 45 to clarify the rule's application in circumstanc-

7. *United States v. Clardy,* 540 F.2d 439, 441 (9th Cir.), *cert. denied,* 429 U.S. 963, 97 S.Ct. 391, 50 L.Ed.2d 331 (1976). *See also Rivera v. Toft,* 477 F.2d 534 (10th Cir. 1973).

In *United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468, 478 (1971), the Supreme Court of the United States said, in part:

But the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense. To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime. Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may

disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.

8. *See* note 7, *supra.*

9. AS 12.25.160 provides:

Arrest is the taking of a person into custody in order that he may be held to answer for the commission of a crime.

10. We note that there is no indication of unreasonable prosecutorial delay in the instant case nor does appellant argue that his constitutional rights to a speedy trial were infringed in the circumstances.

es where an offense is allegedly committed by a prisoner while incarcerated.[11]

█ In his second specification of error, Aldridge takes the position that the superior court erred in giving the following instructions:

Where the facts of the case show knowing possession of illegal drugs, it is unnecessary that a usable quantity be found so long as a sufficient quantity of

the drug is found to permit proper identification.[12]

Aldridge also argues that the trial court erred in its refusal to give the following requested instruction:

You are instructed that the prosecution must prove beyond a reasonable doubt that the defendant possessed a usable quantity of a narcotic drug in order to find him guilty. Possession of an unusable trace or residual debris is not enough

---

11. In this regard, see the recommended standards of the ABA Joint Committee on the Legal Status of Prisoners, 14 Am.Crim.L.Rev. 377, 453 (1977). Section 3.3(a), Criminal Misconduct, provides:

> Where a prisoner is alleged to have engaged in conduct which would be a criminal offense under state or federal law, the prosecutor in consultation with the chief executive officer, should promptly determine whether to charge criminally the prisoner . . . .

The commentary relating to this standard states:

> If an offense is, in fact, serious enough to warrant prolonged punitive incarceration in separate housing, it should be serious enough to persuade a prosecutor to seek an indictment. Although the standard does not specify a time limit, using the word 'promptly' instead, it should generally be possible to decide within three days whether to charge the prisoner with a criminal offense . . .
> If . . . an indictment is sought, this section allows for the continued separate confinement of the alleged offender throughout the criminal process.

*Id.* at 454.

The Model Sentencing and Corrections Act approved in 1978 by the National Conference of Commissioners on Uniform State Laws also addresses this problem. Section 4–511 of the Model Act provides, in part:

> (a) If a confined person is charged with a disciplinary infraction that also is a felony the following apply:
> (1) The chief executive officer of the facility promptly shall notify in writing the prosecuting attorney and suspend any disciplinary proceeding pursuant to this Part involving the infraction, but the chief executive officer may temporarily confine the person to his living quarters or place him in separate housing.
> (2) Within 10 days after delivery or receipt of notification, whichever is earlier, the prosecuting attorney shall inform the chief executive officer whether he intends to prosecute the charged person.

The then-current Manual for Alaska State Adult Correctional Institutions provided the following in section 601, at 8, concerning disciplinary committees:

*Referral to the District Attorney*

Whenever a major infraction amounting to a felony is charged, it is the responsibility of the Superintendent to see that the matter is referred to the local District Attorney within 24 hours of the official decision to refer. The District Attorney will be requested to advise the institution within five working days whether he will prosecute the matter. In any event, further disciplinary proceedings will await the District Attorney's decision. If the District Attorney informs the institution that he will prosecute and the case goes on trial, there will be no further disciplinary action taken by the institution. The action of the trial court will be written onto the original disciplinary report.

However, there is presently no provision in Alaska's statutes or rules which requires the district attorney to make the decision to prosecute within any specified time period in this situation. The only limitation in this regard is the general prohibition of unreasonable preindictment prosecutorial delay, which, again, is not present in this case.

12. The superior court also gave the following instruction:

> The law applicable to the crime of possession of a narcotic drug as charged in the Indictment in this case is as follows:
> 'It is unlawful for any person to . . . possess . . . (or) . . . . have under his control . . . any narcotic drug.'
> The material allegations of the Indictment and the essential elements of the crime of possession of a narcotic drug, each of which the State must prove beyond a reasonable doubt before you may find the defendant guilty of the charge, are:
> 1. That at the time and place alleged, the defendant James Aldridge did knowingly possess an opium derivative;
> 2. That at the time the defendant knowingly possessed such substance, he in fact knew that such substance was an opium derivative; and
> 3. That the substance possessed by the defendant was in fact an opium derivative.

in and of itself to warrant a conviction. However, the possession of a residual debris can be treated as circumstantial evidence of possession of a usable quantity of a narcotic drug. If you do not find that the defendant was in possession of a usable quantity of a narcotic drug, it is your duty to find him not guilty.

We find no error in the rulings of the superior court. The statement of the law embodied in the instruction which the superior court gave to the jury was approved in *Judd v. State*, 482 P.2d 273, 280 (Alaska 1971). Under the authority of the *Judd* decision and *Lee v. State*, 511 P.2d 1076, 1078 (Alaska 1973), we hold that the superior court did not err in refusing Aldridge's requested instruction.[13]

Affirmed.

---

**13.** In short, we decline to reexamine either *Judd* or *Lee* at this time.

The author of this opinion adheres to the view expressed in his concurrence in *Judd v. State*, 482 P.2d 273, 280–83 (Alaska 1971), and reiterated in his dissent in *Lee v. State*, 511 P.2d 1076, 1078 (Alaska 1973), that possession of an unusable trace of a particular drug, in and of itself, is not sufficient to warrant conviction. In my opinion, the unusable quantity found and other direct or circumstantial evidence must be sufficient to support a finding of knowing possession of a usable quantity of the prohibited drug. Therefore, I would reexamine the standard adopted by the majority in *Judd*.

Justice Connor, dissenting in *Lee*, would require presence of a prohibited drug together with other evidence imputing to the defendant knowledgeable and recent possession of the prohibited drug. *Lee v. State*, 511 P.2d at 1078.