UNITED STATES of America,
Plaintiff-Appellee,

v.

Harry CLARDY, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Phillip Alfonso TUCKER,
Defendant-Appellant.

Nos. 75–3409 and 75–3410.

United States Court of Appeals,
Ninth Circuit.

July 22, 1976.

Certiorari Denied Nov. 15, 1976.
See 97 S.Ct. 391.

Carl D. Teitge (argued), Paul Sinnitt, Inc., P. S., Tacoma, Wash., for defendant-appellant in 75–3409.

Robert H. Westinghouse (argued), Asst. U. S. Atty., Seattle, Wash., for plaintiff-appellee.

Kenneth E. Kanev (argued), Asst. Federal Public Defender, Seattle, Wash., for defendant-appellant in 75–3410.

## OPINION

Before CHAMBERS, Chief Judge, and DUNIWAY and MOORE,[*] Circuit Judges.

MOORE, Circuit Judge:

Phillip Alfonso Tucker ("Tucker") and Harry Clardy ("Clardy") appeal from a judgment of the United States District Court for the Western District of Washington, entered on a jury verdict convicting them of assault with intent to murder in violation of 18 U.S.C. § 113(a). Each appellant argues that several allegedly prejudicial trial and pretrial incidents require a new trial.

We disagree and accordingly affirm.

On October 27, 1974, inside the United States Penitentiary at McNeil Island, Clardy and Tucker stabbed fellow inmate Leonard Walker in the mouth and arm. Walker had refused to pay interest on a loan which he had obtained from Clardy, and the stabbing was apparently appellants' notion of retribution. Neither appellant challenges the sufficiency of evidence which proved these facts.

Later in the day, Tucker was confined in segregation where he was joined by Clardy three days later. An indictment charging the two with the crime was handed up on April 1, 1975, their arraignment followed on April 18, 1975, and the trial commenced on July 28, 1975.

▪ Both appellants contend that the failure to commence trial sooner deprived them of their speedy trial rights under the Sixth Amendment. That right assertedly attached when appellants were *de facto* arrested by being placed in segregated confinement after the attack. However, such discipline is not an "arrest" for speedy trial purposes. *Cf. United States v. Smith,* 464 F.2d 194 (10th Cir.), *cert. denied,* 409 U.S. 1066, 93 S.Ct. 566, 34 L.Ed.2d 519 (1972). The identifying indicia of a *de facto* arrest sketched in *United States v. Marion,* 404 U.S. 307, at 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), are for the most part absent here. The prison discipline did not focus public obloquy upon appellants, did not disrupt their "employment" or drain appellants' financial resources. In short, it was not a public act with public ramifications, but a private act. Actual physical restraint may have increased and free association diminished, but unless we were to say that imprisonment *ipso facto* is a continuing arrest, these criteria bear little weight in the peculiar context of a penal institution where the curtailment of liberty is the general rule not the exception. Thus, speedy trial rights did not come into play until April 1, 1975, when appellants were indicted, and therefore, for purposes of such rights, the delay was only two months and 28 days. During this period, appellants' rights were not infringed. The delay was relatively brief and was not employed by the Government to harass. During that period, several motions had to be considered and decided. We do not say that appellants' status as prisoners automatically precluded assertion of the claim presently *sub judice, see Strunk v. United States,* 412 U.S. 434, at 439, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973); *Smith v. Hooey,* 393 U.S. 374, at 379, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), but that based upon all the facts and circumstances, their speedy trial claims are unpersuasive.

Appellants alternatively contend that the five month pre-indictment delay deprived them of due process under *United States v. Marion, supra.* Tucker claims that the investigation of the crime was completed long before the indictment, that the prison measures inhibited the preparation of his de-

---

[*] Honorable Leonard P. Moore, United States Circuit Judge for the Second Circuit sitting by designation.

fense and that the passage of time partially dulled the memory of his alibi witnesses. Clardy goes further and claims that the Government intentionally delayed the indictment for tactical advantage. We disagree.

■ Relative to other cases which have presented this issue, *see, e. g., United States v. Erickson,* 472 F.2d 505 (9th Cir. 1973), it is questionable whether five months could even be characterized as legally cognizable delay. But that question aside, neither appellant has sufficiently demonstrated actual prejudice. The cases are legion which indicate that partial forgetfulness will not suffice. And whatever prejudice resulted from their segregated confinement flowed from the administrative decision to place the men in such facilities and had nothing to do with delay in processing the indictment. Moreover, there were good reasons for much of the delay. Until it became known whether the victim would live or die, the exact nature of the crime could not be ascertained. And until the victim had recuperated, he was incapable of rendering full assistance to the investigative effort. That he may have spoken to Government agents or have withstood transferral to a different hospital within a week of the crime does not mean that he could have endured the extended questioning inevitably associated with thorough case investigation. The case involved numerous witnesses and the investigation most certainly was handicapped by the fact that most of them were prison inmates. There was neither actual prejudice nor intentional delay.

■ Appellant Clardy next urges that the lower court abused its discretion in refusing to require the Government to disclose the names and addresses of all its prospective witnesses. This claim is meritless. In *United States v. Richter,* 488 F.2d 170 (9th Cir. 1973), this Court held that although the district court is not statutorily compelled to grant such discovery, its inherent power to do justice might allow it to do so in the exercise of its discretion. For guidance, the court looked to F.R. Crim.P. 16, which was then the subject of proposed amendments to allow discovery of prosecution witness lists, and held that as a prerequisite to the exercise of discretion, the defendant must prove that the request is material and reasonable. Since the *Richter* decision was rendered, the proposed amendments to Rule 16 that would have authorized discovery of a prosecution's witness list have been rejected. In view of this development and the clear possibility that disclosure of the names and exact whereabouts of inmates who planned to testify against the defendants might have endangered those witnesses, we conclude that the lower court's denial of Clardy's discovery motion was not an abuse of the lower court's broad discretion on this issue.

■ Both appellants also contend that security measures deprived them of due process. Before the commencement of the afternoon session of the first day of trial, appellants' counsel objected to the presence of armed plainclothes Deputy United States Marshals within the courtroom, and uniformed Postal guards outside the courtroom. During the colloquy which ensued, the court indicated the reasons for the security, stating that the case involved a large number of prison inmates which the courthouse was not equipped to accommodate safely and that an outside group had expressed an "interest" in the trial. The court refused to allow defense counsel to question the Marshal about the precise details for fear that such information might work its way into the hands of the defendants, who in turn might use it to attempt to escape. The following morning, outside the presence of the jurors, defense counsel stated that he had seen five armed deputy marshals assisting the unloading of individuals (apparently inmate witnesses) from a van. The judge reiterated his previous remarks and identified the group, which he had stated was interested in the trial as the "SLA".

■ Often a trial court finds itself obligated to simultaneously discharge clashing duties. The trial which engendered this appeal is a good example. On the one hand, it was incumbent upon the court to strive to

preserve impartiality and to avoid allowing anything to undermine the defendant's presumption of innocence. On the other hand, the trial court was charged with the duty to preserve the safety of counsel, jury, witnesses, spectators—in short, everyone inside the courtroom. *Leyvas v. United States,* 264 F.2d 272, at 277 (9th Cir. 1958), *cert. denied,* 359 U.S. 936, 79 S.Ct. 651, 3 L.Ed.2d 637 (1959). Our concern is whether in attempting to reconcile the two duties, the lower court abused its discretion and deprived the defendants of a fair trial. Such inquiry depends upon the peculiar facts to which each appeal is wed. In this case, the facts reveal no error.

The need for security was clear. The court was apprised by reliable sources that a terrorist group might attempt to upset the trial or worse, and there is no dispute that the courtroom and building were ill-equipped to handle the influx of convicted criminals, some of whom had previously been convicted of escape.

The court was cognizant of the defendants' rights and the precautions employed were much less drastic than other measures, the utilization of which has been approved before. The defendants were not shackled. *Compare, Loux v. United States,* 389 F.2d 911 (9th Cir.), *cert. denied,* 393 U.S. 867, 89 S.Ct. 151, 21 L.Ed.2d 135 (1968). Nor were they handcuffed. *Compare, United States v. Kress,* 451 F.2d 576 (9th Cir. 1971), *cert. denied,* 406 U.S. 923, 92 S.Ct. 1789, 32 L.Ed.2d 123 (1972). They were present throughout the course of the trial. *Compare, Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Nobody was searched by an electronic magnetometer. *Compare, United States v. Heck,* 499 F.2d 778 (9th Cir.), *cert. denied,* 419 U.S. 1088, 95 S.Ct. 677, 42 L.Ed.2d 680 (1974).

Moreover, the court cushioned the impact of the security measures that were employed. Only plainclothes persons were within the courtroom. Their weapons were concealed. The defendants were brought into and taken out of the courtroom outside the jury's presence. And finally, the court admonished the prospective jurors:

"Now there are certain this [sic] that you might become aware of in and about the courtroom, and around the premises. As far as you are concerned, that has nothing to do with what you are supposed to be doing. In other words, your job is the same, regardless of what happens as far as the courtroom is concerned, or outside the courtroom. . . ."

This instruction was supplemented with an additional inquiry [1] during the course of the trial.

 Nor was it an abuse of the court's discretion to refuse to disclose the exact nature of the security precautions to the defendants' counsel at trial. *Loux, supra,* at 919. The facts supporting the lower court's apprehension of an attempted escape were different than those in the *Loux* case, but the lower court's apprehension was no less reasonable. Furthermore, the court explained the reasons for the precautions and as neither Clardy nor Tucker were

---

1. Also during trial the court inquired of each juror individually:

THE COURT: Now, Ladies and Gentlemen, I am going to talk to you for a moment about something that may have come to your attention and it may not have. This is not the first time I have ever done this, and probably won't be the last.

I told you last night that when you came back here this morning, to be sure and go directly to the jury room, and not be out in the hallway. You may have noticed that there are a number of men around and about this building, stationed around and about this building, it may have come to your attention. I want to ask each one of you individually if that is going to affect your judgment in any way, as far as your ultimate determination of the case is concerned, in accordance with the rules I am going to tell you about, and what your job is. If you do not understand what I am talking about, I will be more explicit. [sic] There are guards around the building; why they are there is of no concern to you at all, it may be to me, but it is not for you. Now is that factor in and of itself going to influence you so far as your ultimate responsibility is concerned in this case?

(Whereupon, each individual juror was asked the above question and each answered in the negative.)

Each juror answered that it would not. T. 104–05.

shackled, their interest in more detailed information was tenuous. If counsel could not observe the security measures that had been implemented, it is unlikely that those measures affected the appearance of impartiality in the juror's eyes.[2]

■ Appellants next contend that a mistrial should have been declared after an incident occurred at defense counsel's table. During the Government's examination of a prison security officer, the Assistant United States Attorney placed the knife which had been recovered from the toilet in the victim's cell on defense counsel's table for inspection prior to moving its admission into evidence. A deputy marshal who was sitting behind the table stood to grab the knife, but before he could retrieve it, the court ordered defense counsel to hand it to the prosecutor, which he did. Subsequently, defense counsel was required to inspect the knife at the Government table.

This incident was regrettable and should have been avoided, but the Assistant United States Attorney's mistake was inadvertent and the trial judge's prompt poll of the jury

showed that the defendants had not been prejudiced.[3] Even were we to indulge a contrary presumption, we would conclude that the judge's instruction cured the error.[4]

■ Appellants also contend (without the benefit of prior case authority) that the court erred when it denied a mistrial motion predicated upon a bomb explosion in the courthouse. After the court recessed on the sixth day of the trial (the day before the verdict was rendered), a bomb detonated in the building, one floor below the courtroom. Nothing suggested or suggests that either appellant was in any way linked with the bombing. The following morning the court promptly polled the jurors individually to determine whether the incident had affected their view of the defendants or the proof. All the jurors denied that the incident would affect their obligations. The court also instructed them to ignore it and reminded them of their obligations to judge the case on the facts.[5] In view of this curative instruction and the jurors' responses to the judge's inquiry, we agree with the

2. Appellants, citing *United States v. Samuel,* 431 F.2d 610 (4th Cir. 1970), also argue that the trial court abused its discretion by delegating its authority to the Marshal. But *Samuel* is inapposite. In that case the trial court employed extremely conspicuous security measures without intimating any justification. Here the court stated its reasons outside the presence of the jury and the security measures were relatively unobtrusive.

3. "* * * Well this morning, and you are all aware of it, an envelope came from Mr. Byrd, the FBI agent, Mr. Butcher said he handed a knife to Mr. Byrd. Now they handed this envelope, and I didn't know what was in the envelope, but Mr. Byrd handed the envelope to Mr. Westinghouse, who in turn walked over and turned it over to Mr. Kanev. Well Mr. Kanev opened up the envelope and pulled out a knife. Now a cardinal rule in a courtroom is to keep weapons of any character out of the view of the jury, except those that are going to be used as exhibits, and of course I don't believe anything would have happened at all, but suppose something would have happened, then it would be my fault for not taking some action. So all I did was say to take the knife and hand it back. Now is there anyone on this jury who would be affected by that action that I took this morning so that you couldn't be a fair juror?

If there is anyone, please raise your hand; does anyone feel he or she couldn't be a fair juror on account of that incident?

All right. Of course you are not supposed to be affected by it, not in any way, all of you said you were going to listen to the testimony here, and then make a decision based on what you hear from the witness stand, from the exhibits admitted into evidence, and the law as I give it to you.

All right, now let's get on with the case." T. 209–210.

4. *Id.*

5. "* * * Now it is quite apparent to all of you, the security measures that are being invoked in the building, and of course from what you must undoubtedly have learned, that an incident occurred here yesterday after court recessed that required, or was quite widely circulated newswise, and you of course know what I am talking about, that a bomb of some character was placed in the restroom on the second floor and ultimately it detonated. Of course that is what I am talking about.

If you think about it, it really has nothing to do with our ability to conduct this trial fairly, as you agreed to do, because you have sat there and you have listened to the testi-

lower court that appellants were not prejudiced or deprived of a fair trial by this incident. Consequently, to hold that they were would merely tempt terrorists to make criminal justice a hostage.

■ Appellants also contend that the press coverage of the explosion was one instance of prejudicial publicity which, considered cumulatively, deprived appellants of a fair trial. During the second day of trial, an eleven paragraph article about the trial appeared in *Tacoma News Tribune*.[6] At the commencement of the third day of trial, the court conducted a *voir dire* of the jurors individually to probe the possibility of prejudice.[7] Only three jurors had seen the article and in response to further questioning

mony in this case, there is some more to be heard but not much more, but you have heard the testimony on both sides in this case, and you will hear what I tell you the law is. Now I haven't changed my views so far as what I should instruct you, as far as the law is concerned, or about whether or not I am going to make any comments about this case; I am not going to make any comments, as I am permitted to do under the law, but I am not going to change my position in any way, and I would hope that you will not either, and I am satisfied that you won't; I am satisfied that when you think about it you will only consider the testimony you have heard, and determine who you think told the truth at the time they testified, apply the law as I give it to you, and then arrive at your verdict.

Now I am obliged to ask you, and I will ask you individually; did your knowledge of that incident that occurred, or anything else that you can think of, Mr. Wetstein, alter in any way what you previously said concerning your willingness to try the case in accordance with the law?"

[The judge asked the same question of each juror.]

\* \* \* \* \* \*

"THE COURT: Now, Mrs. Johnson, last night everybody that was in the building was asked to evacuate, and unfortunately for Mrs. Johnson, she didn't get a chance to leave, she happened to be standing on the corner, and I saw Mrs. Johnson, and other people saw Mrs. Johnson at the time. You may have seen the defendants when they came out of the building, did you see them, Mrs. Johnson?

MRS. JOHNSON: No, I did not.

THE COURT: All right, that ends that one too.

Now, we will proceed with the trial, and any matters that any counsel have to bring up, we will discuss them at recess."
T. 1154–57.

6. SECURITY HEAVY AT INMATES' TRIAL
By JONATHAN NESVIG
TNT Staff Writer

The assault trial of two inmates at McNeil Island Federal Penitentiary began Monday in federal court under heavy security.

Eight deputy U.S. marshals were present in the courtroom as a jury of eight women and four men was selected during the afternoon to hear the trial of Harry Clardy and Phillip A. Tucker.

Other marshals were stationed outside the courtroom and building, while a number of armed security patrolmen were present throughout the courthouse.

WHEN TUCKER'S attorney, Kenneth Kanev, complained that such a show of force could prejudice the jury, U.S. District Court Judge William N. Goodwin revealed that "a group in Oakland seems to be interested in this trial."

The judge said he had learned this through "a source I don't care to reveal."

Goodwin also said he would not "second-guess" the security plans of the U.S. marshal and that precautionary measures are necessary to handle the many McNeil inmates who are expected to testify.

Clardy and Tucker, both convicted bank robbers, are accused of stabbing fellow inmate Leonard D. Walker last Oct. 27 with intent to commit murder.

Before the jury was selected, Goodwin had the defendants and defense attorneys read a 1970 U.S. Supreme Court decision concerning the maintenance of courtroom order.

LAST MONTH during a pre-trial hearing, Tucker shouted obscenities and called the judge names. There were no such outbursts Monday.

The Supreme Court decision permits order to be maintained by removing a defendant from the courtroom, citing him for contempt or gagging him.

The prosecution was to begin presenting its case Tuesday following opening statements by both sides.

7. " \* \* \* Now here is another thing; in last night's Tacoma paper there was an article which said something about the trial and other things. Now in some cases they do what it known as sequester jurors, that is, they keep them locked up in a hotel somewhere. Well that is expensive, and in my judgment in most instances it is unnecessary. But you read the paper, and you watch television, and am I supposed to sit here and say don't do that? Now we have in this country what is known as freedom of the press, the press is entitled to write things that they wish to write, and you I think are aware of

each indicated that it had not affected his ability to decide the case. After the conclusion of the day's testimony, the court admonished the jury, *inter alia,* that "hopefully you won't hear or read [any additional news coverage of the case]", and although press coverage continued throughout the duration of the trial, the court's *voir dire* questioning disclosed that none of the jurors saw or heard any of the later articles.[8] The explosion and subsequent court inquiry adverted to earlier, capped these events.[9]

Citing *United States v. Polizzi,* 500 F.2d 856, at 879 (9th Cir. 1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975), appellants contend that the lower court did not adequately probe the possibility that prejudice resulted from these incidents. However, their reliance is misplaced, for, if anything, application of *Polizzi* supports appellee. In *Polizzi, supra,* at 880–81, this court stated:

"The trial judge carries a difficult burden. He is called upon to question the jurors, but repeated questioning could itself be prejudicial in inciting in the jurors 'joint or individual curiosity and encourage attempts to read the very newspaper articles sought to be kept from their knowledge' [citations omitted]. His very questions may disclose or accentuate controversial issues. Unless he has clearly abused his discretion, we shall uphold the trial judge's delicate estimation of the needs of the case of which he has first-hand experience."

Based on the particular facts of this appeal we conclude that the trial court did not abuse its discretion. Two jury interrogations revealed that none of the jurors had even viewed or heard publicity about the trial. To have delved further would only have risked disclosing in the course of the *voir dire* the substance of the material which was allegedly prejudicial. In the instance where three jurors had read the newspaper article, the court was entitled to rely on the jurors' subjective assessment of their impartiality. At the time of incident, that was apparently the only article which had appeared. Thus, publicity was not sufficiently substantial to require the court to pass beyond the juror's own assessment.

Even were the *Polizzi* holding favorable to appellants, we would have to note that here the publicity as a whole was scarcely as pronounced. There was no pre-trial publicity, and until the sixth day of trial, only one short article had come to the attention of only three members of the jury. Thus, even assuming that the jury had viewed the article which appeared after the sixth day

that. So I can't tell a newspaper reporter during the course of these proceedings what he can write and what he can't write. In some instances he writes what he thinks happened, and in some instances I don't think that happened, but in any event, whatever he writes should not affect your judgment and I will tell you why; do you want him to tell you how to decide the case, or do you want him to furnish the facts upon which you decide this case? Of course not, because you have all told me that you are going to decide it based upon the evidence you hear from the witness stand. So that article that appeared last night, I don't know whether you read it or whether you didn't, but I am going to go over—I have to do this, I don't like to but I have to—I am going to ask each of you, how many read the article? All right, there are three hands, so I will ask those three; Mr. Wetstein, did that article in your judgment affect your ability to decide this case?

MR. WETSTEIN: I certainly don't see why it should.

THE COURT: All right, Mrs. Brannock?
MRS. BRANNOCK: No, your Honor.
THE COURT: All right, Mrs. Ford?
MRS. FORD: No, it would not.
THE COURT: All right, Now I am probably going to have to do this until the case is finished, and I dislike doing this; I don't want you to get the impression that I question your integrity, anymore than I would like to have you question mine, or question my reasons for the rulings I make, I certainly don't make rulings to try to keep things from you that you should know, but I want you to know what you are supposed to know so you can make an appropriate and proper decision, and that is what I have in mind.

All right, now we will continue with the cross examination of Mr. Walker."
T. 353–55.

8. T. 540–41; T. 734–35.

9. *See* note 5 supra.

of trial[10] and had heard about the explosion, we conclude that the judge's inquiry and admonitions were adequate to preserve an impartial atmosphere consistent with appellants' rights to a fair trial.

■ Somewhat tangentially, appellant Tucker contends that error was compounded when the trial court denied his motion for the addresses of the jurors. Tucker wanted to contact the jurors and to see whether any "extraneous prejudicial material" had come to their attention. However, the trial court's action was proper and Tucker's motion frivolous. Nor was any showing made that any of the jurors had seen such material.

■ Finally, appellant Tucker contends that the court improperly excluded evidence of witness Neaderhiser's inability to identify Tucker as the assailant during a photographic show-up. Tucker first sought to elicit the testimony by calling Gene Reitschel, the law student who interviewed Neaderhiser for the defense and conducted the show-up. After sustaining the Government's objection, Tucker made a formal offer of proof that Reitschel would have testified that Neaderhiser, a purported eye-witness to the crime, did not identify Tucker as the assailant although he was shown Tucker's photograph during the show-up. Tucker then attempted to introduce the evidence through Neaderhiser. The court again refused to admit the evidence, but Neaderhiser did testify that he was unable to identify Tucker as one of the inmates who had entered the cell. Even ignoring the fact that Rule 801 (Fed.Rules Evid.Rule 801, 28 U.S. C.A.) contained no provision authorizing the admission of statements of identification until it was amended effective October 31, 1975,[11] and without regard for whether a

---

10. INMATE SAYS MEN ON TRIAL
 INNOCENT

By BILL RIPPLE
TNT Staff Writer

An inmate of McNeil Island Federal Penitentiary who witnessed the brutal stabbing of another inmate last fall testified in federal court Monday that neither of two men on trial for the attack took part.

The inmate's testimony came as attorneys for Hary (sic) Clardy and Phillip A. Tucker opened the defense portion of the week-old trial in U.S. District Court here. Tucker and Clardy, both convicted bank robbers, are accused of assaulting fellow inmate Leonard D. Walner (sic) with intent to commit murder last Oct. 27.

WALKER, 31, who was stabed (sic) three times during the assault, testified last week that both defendants attacked him in his cell over a disagreement involving a $50 loan. Possession of money at the institution is illegal.

Duane Neaderhiser, a cellmate of Walker's who saw what happened but refused to cooperate with a prison investigation because he didn't want to get involved, told the jury Monday that neither defendant was in the cell at the time of the attack.

The inmate said he had just returned to the cell where Walker was talking with another inmate when a third man rushed inside. The witness fled the cell at that time and although he claims he was unable to identify either of the attackers, he nevertheless said they were not Clardy or Tucker.

Under cross-examination, Neaderhiser, who is scheduled for release next month, admitted that he lied to prison officials about what he saw. The witness explained that he didn't think what he knew was important since he couldn't identify anybody.

OTHER DEFENSE testimony contradicted that given by prosecution witnesses last week. Several prison officials were asked about prison procedures and security measures.

Neaderhiser was one of eight defense witnesses called after Judge William N. Goodwin denied their motion for a mistrial on the grounds that news coverage of the trial had biased the jury.

Defense attorney Kenneth Kanev referred to a story in Thursday's edition of The News Tribune which reported an alleged death threat against the judge by Tucker.

The death threat surfaced in a closed session of the court but was leaked to a reporter who along with the public was barred from the courtroom at the time.

Judge Goodwin, in an effort to learn the source of the leak, polled everyone who was in the courtroom during the closed session, but all denied talking with the reporter.

VERY STRANGE, the judge concluded. He labeled the incident a deliberate attempt to cause a mistrial and said he strongly suspected that someone connected with the defense had leaked the information.

Defense attorneys bridled at the suggestion and further complained of misstatements in one of the newspaper stories.

The judge ruled against the motion, however, when members of the jury denied having read the news accounts of the trial.

The trial resumed today.

11. 28 U.S.C. Fed.Rules of Evidence 801 (1976 Supp.)

statement of identification is different from a statement of non-identification, we conclude that the court's ruling was not error. While identification statements are admissible, a refusal to admit is not erroneous unless it constitutes an abuse of discretion. Considering that the evidence offered in this case would have been merely cumulative we conclude that there was no such abuse in this case.

None of appellants' grounds for appeals considered separately are persuasive, and this is not a case where an accumulation of isolated errors dictates reversal.

Judgments affirmed.