Charles FLYNN, Petitioner, Appellant,

v.

Terrance HOLBROOK, et al.,
Respondents, Appellees.

No. 84–1266.

United States Court of Appeals,
First Circuit.

Argued Sept. 12, 1984.

Decided Dec. 7, 1984.

Barry P. Wilson, Boston, Mass., for petitioner, appellant.

John A. Murphy, Sp. Asst. Atty. Gen., Providence, R.I., with whom Dennis J. Roberts, II, Atty. Gen., Providence, R.I., was on brief, for respondents, appellees.

Before COFFIN, Circuit Judge, ALDRICH and COWEN,* Senior Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

Petitioner Flynn appeals from the district court's, 581 F.Supp. 990, denial of a writ of habeas corpus. He, with five co-defendants, was tried to a jury in the Rhode Island superior court, charged with a highly publicized armed robbery of a safe deposit vault. There had been no violence. Flynn and two others were convicted; the rest acquitted. The convicted defendants appealed, unsuccessfully raising the points now presented. Flynn, alone, sought habeas corpus, again without success. We reverse.

---

* Of the Federal Circuit, sitting by designation.

From the start of the trial defendants were brought to court accompanied by four uniformed, and conspicuously armed, state troopers, who sat, throughout, directly behind them in the front row of the spectators' benches. Upon defendants' timely protest that this created an "armed camp," the court stated that the matter was out of its hands, and that the makeup and number of the security squad was determined solely by delegates of the Supreme Court Committee on Security. To defendants' complaint that uniformed state police had never appeared at a Rhode Island trial before, the court replied,

"But the rights of the defendants are equally safeguarded by an examination of the jurors."

Defendants immediately sought certiorari. In reversing and remanding, the Rhode Island Supreme Court (hereinafter court, or Rhode Island court) stated,

"The presence of armed, uniformed police officers acting as a security force in criminal courtrooms in this jurisdiction is a departure from the practice usually found in the trial courts of this state .... [It] might be considered a form of restraint, and a showing of the need of their presence should be required in such circumstances. A.B.A. Project on Minimum Standards for Criminal Justice, Standards Relating to Trial by Jury, (Approved Draft 1968), standard 4.1(C), Comment, p. 94.... The presence of the State Police is a decision that must be resolved by the trial judge after consideration of all relevant factors." *State v. Byrnes*, 116 R.I. 925, 357 A.2d 448, 449 (1976) (*Byrnes I*).

The particular comment cited read, in part,

(C) Defendants and witnesses should not be subjected to physical restraint while in court unless the trial judge has found such restraint reasonably necessary to maintain order. If the trial judge orders such restraint, the judge should enter into the record of the case the reasons therefor ....

The court's directions were plain. The presence of armed, uniformed troopers is viewable as a form of physical restraint, unusual, and not to be countenanced short of a finding that it was "reasonably necessary to maintain order." In such event the court was to record its reasons for so finding. In spite of this, when the hearing ordered by the court took place, nothing of any kind was offered as to the need, let alone as to an unusual need, to maintain order. The only evidence presented came from two officials, who testified to personnel problems. It seems that because of the demands of the Presiding Justice there was a shortage of commitment officers who generally handle prisoners. Consequently, a request for back-up had been made of the state police. Commitment officers were, if armed, not noticeably so. By union contract, state troopers could not appear out of uniform, or without visible arms. When it appeared that the Presiding Justice was sitting without a jury, defendants suggested to the court what might seem the logical solution, viz., to send the troopers to the P.J.'s court. The response was that this was an undesirable choice because the commitment officers were better trained than the police for the work in that court.

The evidence stopped there. Nothing was offered as to the character, conduct, or disposition of any of the defendants, or of any other circumstance that might threaten the maintenance of order. Obviously, there was no, and could be no, finding of such. Nor was attention, apparently, paid to counsel's assurances that their clients would behave, nor consideration given to why, if only armed officers were available, there needed to be so many, nor, finally, why they needed to sit so conspicuously close to the defendants. Hence, matters were back at square one, with, if we may say so, a thump. Convenience, a manpower shortage, even, incredibly, a union contract, determined who was to be present and, apparently, the troopers themselves, decided where they would like to sit. Alternatively, the prosecutor made that decision, which would be no better.

In an at best trivial recognition of the instructions to consider the need for special

restraint, the trial judge stated that it was his "conviction that the Supreme Court [in giving its instructions] has not been informed that the defendants on trial here are being held without bail.... [If it were not for that] there would not be any state policemen in this courtroom, uniform or plain clothes." It seems hardly necessary to observe that many defendants are incarcerated during trial; indeed, they are the only ones as to which a need for restraint arises. Inability to make bail is the common factor that fathers the vast percentage of cases discussing excessive restraint. Even more to the point, the trial judge had apparently not read the court's order with enough care to note the third sentence thereof.

> "The petitioners, all of whom have been indicted on the charges of robbery, are being held without bail." *Byrnes I,* 357 A.2d at 448.

On this basis he held to his earlier belief that, so far as defendants' rights were concerned, it was enough to make inquiry on the voir dire whether the presence of the officers would affect the juror's decision, a practice he was already engaged in when he was reversed for its insufficiency.

■ Unfortunately, as we shall develop, since physical restraint, or, more exactly, the exhibition thereof to the jury, is antithetical to the presumption of innocence, the *Byrnes I* order was not only correct, but constitutionally obligatory. *See Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). The trial court's total, and, we may add, inexplicable failure to observe it, requires the vacation of a conviction resulting from a trial that lasted in excess of two months, without any other prejudicial error. Because of the seriousness of this, and the seriousness of our disagreement with the Rhode Island court's ultimate disregard of a basic constitutional principle, we write at greater length than we perhaps otherwise might.

His conviction having been affirmed on appeal, *State v. Byrnes,* 433 A.2d 658 (R.I.

1981) *(Byrnes II),* post, Flynn, after several false starts, brought this petition. In denying the writ, the district court said,

> "To repeat the characterization employed by the Rhode Island Supreme Court, the circumstances of this trial were veritably 'extraordinary.' *Id.* at 663. And, the need for, and extent of, security measures are generally held to be within the sound discretion of the trial court. *United States v. Gambina,* 564 F.2d 22, 24 (8th Cir.1977); *United States v. Clardy,* 540 F.2d 439, 442–43 (9th Cir.), *cert. denied,* 429 U.S. 963 [97 S.Ct. 391, 50 L.Ed.2d 331] (1976); *Kennedy v. Cardwell,* 487 F.2d 101, 108–09 (6th Cir. 1973), *cert. denied,* 416 U.S. 959 [94 S.Ct. 1976, 40 L.Ed.2d 310] (1974). *Cf. Woodard v. Perrin,* 692 F.2d 220, 221–22 (1st Cir.1982). Even though security precautions may in some measure deprive a defendant of the physical indicia of innocence, they are not *per se* prohibited; rather, the necessity for the employment of such procedures obligates the trial court

>> to simultaneously discharge clashing duties.... On the one hand, it was incumbent upon the court to strive to preserve impartiality and to avoid allowing anything to undermine the defendant's presumption of innocence. On the other hand, the trial court was charged with the duty to preserve the safety of counsel, jury, witnesses, specators—in short, everyone inside the courtroom.

> *Clardy,* 540 F.2d at 442–43. Judge Giannini, called upon to juggle these competing considerations, performed the resultant balancing with care. His conclusion that, in this instance, the interests of justice required the presence of the troopers, while perhaps fairly debatable, was well within the perimeters of his discretion. *E.g., Gambina,* 564 F.2d at 24. The necessity for heightened security for this trial was manifest. As noted by the state supreme court, the *voir dire* of the venire disclosed no prejudice attributable to the presence of the police. Less totalitarian alternatives appear to

have been explored and rejected on rational grounds. The security measures approved here, extreme though they may have been, did not, under the totality of the circumstances, deny due process or equal protection to the petitioner. *See Hardee v. Kuhlman,* 581 F.2d 330, 331–32 (2d Cir.1978); *United States v. Howell,* 514 F.2d 710, 714–15 (5th Cir.), *cert. denied,* 423 U.S. 987 [96 S.Ct. 396, 46 L.Ed.2d 304] (1975)."

We extensively disagree. The Rhode Island court said the presence of the armed state police was an extraordinary event, not that the circumstances of the trial were extraordinary. The trial judge had not balanced with care the competing considerations of avoiding the undermining of the defendants' presumption of innocence and preserving the safety of counsel, jury, witnesses and spectators. Rather, with no threats shown to safety, he balanced nothing, but simply indicated a fear that since the defendants had not been bailed, they might flee from the courtroom. There was no evidence even suggesting any unusual likelihood of this; nor had anything whatever made "manifest" the "necessity for heightened security." As for the exploration of less "totalitarian alternatives," the exploration was limited, notwithstanding defendants' suggestions, to inquiring whether regular commitment officers were available without inconveniencing the Presiding Justice, and whether the union contract permitted the state police to appear out of uniform and unarmed.

Even if, instead of falling far short, the facts had been as the court stated, the law, as demonstrated by five of the six cases cited in its opinion would not have supported its result. In *Kennedy v. Cardwell,* 487 F.2d at 108–09 the court said,

"... [G]uards seated around or next to the defendant during a jury trial are likely to create the impression in the minds of the jury that the defendant is dangerous or untrustworthy.... [G]uards can be strategically placed in the courtroom when more than normal security is needed and can be hidden in plain clothes, [and] the jury never needs to be aware of the added protection so that no prejudice would adhere to the defendant."

*United States v. Cardy,* 540 F.2d at 442–43 is to the same effect, the court emphasizing that the guards wore plain clothes, and carried their weapons concealed. To this we would add a citation to *United States v. Jackson,* 549 F.2d 517 (8th Cir.1977), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379, where the court described a *Cardy* scenario as "maximum security." Again, in the court's twice cited case of *United States v. Gambina,* the court had noted, (a) that the defendant had been convicted of a prior attempt to escape, and had threatened to do so again, and (b) that instead of guards "seated around the defendant," the court had done its best to preserve the defendant's presumption of innocence by stationing nonuniformed marshals at the courtroom door. 564 F.2d at 24. These were hardly authorities to justify a finding of the trial court's careful balancing of "avoid[ing] allowing anything to undermine the defendant's presumption of innocence ... [and] preserv[ing] ... safety."

Such citations could be readily multiplied. The district court cited only one case to the contrary. In *Hardee v. Kuhlman,* 581 F.2d 330 (2d Cir.1978) (2–1) the district court denied habeas corpus with relation to a state court murder trial in which several armed guards were continuously in the courtroom; one seated three feet behind the defendant. No special need was manifest. In affirming, the court noted that this was apparently New York procedure. The court cited no authority, and contented itself, as we believe it had to, by disagreeing with, or attempting to distinguish, the many cases cited by the dissenting judge. We must regard the majority decision as singularly unpersuasive.

Most important of all, the district court failed to cite cases from our own circuit. In *Young v. Callahan,* 700 F.2d 32 (1st Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 194, 78 L.Ed.2d 170, decided the year

previous, we held it was an excessive, and hence unconstitutional, restraint to confine the defendant in a prisoner's dock during trial without a showing of special need, as being a "constant reminder of the accused's condition." 700 F.2d at 35. Of particular pertinency, we had said, "Where some form of security is essential, the dock seems far superior to surrounding the defendant with security personnel." *Id.*, at 36. The state's brief would distinguish *Young* by saying, "The use of a prisoner's dock to physically confine a defendant at trial is *obviously bound to be obtrusive and more likely prejudicial* to a defendant's right to a fair trial than is the mere general presence of armed police in the courtroom." (Emphasis suppl.) We can sympathize with counsel having to make bricks without straw, but not to this extent.

Returning to the case at hand, the trial judge was neglectful of the fact that his reversal had been with the court's knowledge that defendants had not been admitted to bail; oblivious to the court's language and its citations of ABA Standards emphasizing that physical restraint should be the minimum needed, and, seemingly, forgetful that his reversal had occurred in spite of the fact that the jurors already, as the reversing court knew, were being examined for possible prejudice on the voir dire. Proceeding precisely as if nothing had happened, the trial court concluded,

"I am firmly convinced [in the light of the voir dire, that the presence of the armed, uniformed troopers] in this courtroom, has no effect whatsoever upon the constitutional rights of these defendants."

To us surprisingly, in view of its own, explicit, opinion in *Byrnes I,* the Rhode Island court, based on the voir dire, with equal assurance, and equal lack of any supporting authority, agreed. "... [W]e find no reason whatsoever to fault his conclusion." 433 A.2d ante, at 663.

We might find it very difficult to have such total confidence in the jurors' disclaimers, even a priori, in light of the answers of some of them indicating a belief

that the troopers were there to "protect" the jury and the audience. We would ask, protect them from whom? However, we do not rest our decision on such a factual issue. Even if all jurors had indicated an unreserved opinion that the troopers' presence would not affect them, such expression, on a case as extreme as this, where there was no need to rely on it, is totally unacceptable.

It is human nature to believe that one is able to disregard "irrelevancies," and to be totally fair and impartial, or, alternatively, it is human to be unwilling to admit publically that one cannot. But even if one believed it fully at the time, insidiously this obliviousness can wear off. Observing, for over two months of trial, and constantly reminded, perhaps of the burden or of the expense, of keeping, not one, but four armed troopers daily in court sitting immediately behind the defendants, how could one help but think the state had cause to believe that there was a compelling necessity therefor. This was far more than a symbolic guard. Must not these, undoubtedly unarmed, defendants be very bad men, certainly not to be trusted? *See Kennedy v. Cardwell*, ante. Were some equally bad confederates going to try to spring them from the very courtroom? With all respect to the Rhode Island court, it is beyond our imagination how this vivid, and constant, show of force could fail to detract from the presumption of innocence.

At the expense of repetition, we are not talking about cases where a compelling necessity required the physical restraint, so that accepting the jurors' assurances is the best that could be done. Nor are we concerned with a single incident which a juror might be able at least to remove from the front of his thinking. Further, there is a significant difference between seeing a defendant with heavy armed restraint in the courtroom, and outside, simply while being transported. *United States v. Ayres,* 725 F.2d 806, 812–13 (1st Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 84, 83 L.Ed.2d 31. Almost anyone might have a temptation to escape when outside of the

courtroom and relatively free. Once defendants are safely seated inside, a constant guardian of four armed officers speaks in superlatives, in terms of extraordinary apprehension, not routine caution.

In this posture the state argues that the error was harmless. We doubt whether we could ever find such an unnecessarily striking display harmless. For a state to go out of its way to create this "extraordinary" atmosphere, to quote *Byrnes I,* and then turn around and say it was meaningless, comes, we regret to say, close to disingenuousness. In any event, we reject the reasons given for calling it harmless. The fact that the jury found some of the defendants not guilty could merely mean, if we were to be cynical, that it was demonstrating how open-minded it was. Or, it could have concluded that, as we are told, the evidence against some defendants was weaker than against others. The fact that close restraint was believed needed does not necessarily mean it was needed as to all the defendants.

Nor was the evidence against this defendant overwhelming. While we find the admission of the highly important identifying testimony, post, not to have been error, defendant's attack on it could not be called insignificant.

■ In anticipation of a new trial, we deal briefly with Flynn's other points. We quite agree with the Rhode Island court's supporting the trial court's refusal to permit defendant's making an opening immediately following the prosecutor's, when counsel's announced proposal was to argue the merits and demerits of the case rather than simply to present the defense in narrative form. It is legitimate for a court to consider the purpose of an opening is to tell the jury what the case is about, not to tell it how to go about deciding it. Flynn's approach, to attempt to persuade or influence the jurors by argument, was comparable to the growing tendency we have noted in other jurisdictions with respect to allowing counsel to conduct a psychologically-oriented voir dire, viz., to introduce the skills of advocacy before the evidence has even

started. A trial should be on evidence, aided by advocacy, not the reverse.

■ We also agree with the court in the matter of Flynn's choice as to his time of testifying. Early in defendants' case one of the other defendants called Flynn to the stand and asked him a few questions, including whether he, Flynn, had robbed the vault. On his denial, counsel turned him over to his own counsel, who said, "No questions at this time, Your Honor." Upon the court asking him what he meant by "not at this time," counsel replied that he did not know whether "any other cross-examination ... will open an area that has not been opened up." None did. The state contented itself with introducing Flynn's criminal record, to which he made no rejoinder.

Later Flynn's counsel sought to put him back on the stand. The court reminded counsel of the local rule that permitted a witness to testify only once and refused. One member of the court has some question whether the record shows that defendant was sufficiently aware that his taking the stand for another defendant—a voluntary action since, as a defendant, he was free to refuse—would be construed as a waiver of being called later on his own behalf. If he was, he caused his own predicament. We do not assume that this state rule would prevent a defendant's being recalled on rebuttal, or for some special reason, but we see nothing unconstitutional in a rule that says one cannot put in one's main testimony in segments. In any event, this question will not arise again.

■ Finally, we affirm the propriety, under the fourteenth amendment, of eyewitness Barbara Oliva's in-court identification of Flynn as the second robber. The trial court excluded Oliva's pretrial identification of Flynn at his joint bail hearing, finding that the state's failure to have notified his attorney violated Flynn's sixth amendment rights. The admissibility of Oliva's subsequent in-court identification depends on its reliability under the totality of the circumstances, as determined by the five-

part test of *Manson v. Brathwaite*, 432 U.S. 98, 114–16, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Also pertinent is whether there was a "very substantial likelihood" that the illegal confrontation between the witness and the defendant tainted her later in-court identification. *See Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972); *Simmons v. United States*, 390 U.S. 377, 383–84, 88 S.Ct. 967, 970–71, 19 L.Ed.2d 1247 (1968). In assessing these issues, *Sumner v. Mata*, 449 U.S. 539, 547, 549, 551, 101 S.Ct. 764, 769, 770, 771, 66 L.Ed.2d 722, and 28 U.S.C. § 2254(b) impose now upon defendant the considerable burden of proving, by convincing evidence, that the record does not support the court's findings. Unfortunately for him, the record provides ample support.

First, we find very unlikely any adverse effect of the confrontation on the in-court identification. Oliva made two accurate identifications of Flynn before she confronted him at his bail hearing. The first was on August 20, 1975, six days after the robbery. At this time, she gave a detailed description of the first robber but, compared with her second description on August 26, only a partial description of the second. Although, once admitted, the jury could have questioned why her first description was not as complete as her second, we find her description on August 20 of Flynn's height, weight, hair color and style, and clothing, sufficiently detailed and accurate to permit a finding excluding a tainting effect from the later confrontation. *Cf. Velez v. Schmer*, 724 F.2d 249, 252 (1st Cir.1984) (identification not accurate where witness fails to describe height, weight, build, skin color, "or other indicia of appearance"). Moreover, on August 26, Oliva fully described Flynn, including his facial features, and drew a picture of him which the court described as "not an unfair likeness."

True, there are arguable flaws. First is Oliva's statement on August 20 that she could not say more about Flynn because she "did not see his face." Second is her failure to identify Flynn's photograph from those shown to her on August 26. The trial court interpreted her August 20 statement as referring to Flynn's entrance at the beginning of the robbery, at which time his arms obscured his face. The record supports this interpretation as plausible and our function is not to second-guess the trial court where its findings are supported. The court discounted her failure to select Flynn's photograph, observing that "[t]here is no similarity at all between that photograph and as Mr. Flynn appears today." We also note, in finding no taint from the confrontation if Oliva's in-court identification is otherwise reliable, that the confrontation itself was not highly suggestive. Unlike the facts before us in *Velez v. Schmer*, 724 F.2d at 250–51, the police never directly questioned Oliva during the confrontation. Neither did they tell her that Flynn was present at the bail hearing. Oliva had previously told the police that there were seven robbers; only five men appeared at the bail hearing, and, according to the trial court, one other, Tillinghast, could have fit Oliva's general description of robber number two. Certainly this confrontation was not necessary, *see Velez v. Schmer*, 724 F.2d at 251, but neither was it so suggestive as necessarily tainting the later identification, especially in light of her earlier descriptions.

Defendant's strongest point relates to the pillow-case interference with Oliva's vision. The jury did not accept it. We have read the testimony favorable to defendant with care, but also the court's careful analysis of the evidence meeting it, and cannot say that the court was plainly wrong. The court saw the witness, and was impressed with her "extremely acute powers of observation and recollection and attention." It is not our duty to approach the question de novo.

Reversed; the writ to be granted.