**Charles FLYNN**

v.

**Terrance B. HOLBROOK.**

**C.A. No. 83–0528 S.**

United States District Court,
D. Rhode Island.

Feb. 24, 1984.

Charles Flynn pro se.

Dennis J. Roberts II, Atty. Gen., John A. Murphy, Sp. Asst. Atty. Gen., Providence, R.I., for defendant.

## MEMORANDUM AND ORDER

SELYA, District Judge.

This application for a writ of habeas corpus was originally filed in the United States District Court for the District of Massachusetts, and was transferred here by order of that court (Garrity, D.J.) entered on August 18, 1983. The basis for Judge Garrity's order was that the named respondent (the superintendent of the Mas-

sachusetts Correctional Institution—Norfolk) was acting for the director of the Adult Correctional Institution, Cranston, R.I. Since the latter was and is the custodian ultimately responsible for the petitioner's confinement, transfer to this district appears proper. *Wilkins v. Erickson,* 484 F.2d 969, 972–73 (8th Cir.1973). Jurisdiction anent the application is premised on 28 U.S.C. §§ 2241–2254.

The petitioner, Charles Flynn, was found guilty by a jury in the Rhode Island superior court, Judge Anthony A. Giannini presiding, on charges of robbery, kidnapping and a melange of other crimes.[1] The trial arose out of one of Rhode Island's most infamous episodes (the so-called "Bonded Vault" hold-up, which took place on August 14, 1975). Subsequent to Flynn's 1976 conviction, he appealed to the state supreme court. That tribunal, in a lengthy and scholarly opinion authored by Justice Murray, exhaustively analyzed and unequivocally rejected eight distinct arguments advanced by Flynn and his codefendants. *State v. Byrnes,* 433 A.2d 658 (R.I.1981). Flynn's motion for reargument was denied on August 13, 1981.

Following conviction, imposition of sentence, and his unavailing appeal, Flynn (with others), represented by veteran counsel, filed in this court a petition for habeas relief substantially identical to the instant application. That petition, *United States ex rel. Byrnes v. Moran,* C.A. No. 81–0566, was, upon the recusal of Judges Pettine and Boyle, transferred on March 19, 1982 to the United States District Court for the District of New Hampshire (and there docketed as C.A. No. 82–162–D). Its lifespan in that district was brief; on May 7, 1982, Flynn and his co-petitioners withdrew the application (the Rhode Island Attorney General interposing no objection). Judgment was entered by the clerk on May 12, 1982. Nothing daunted, Flynn sought a reduction of his sentence in the state superior court, which motion was denied as to Flynn by a three-judge panel of that court

---

1. The offenses are limned in the state supreme court's opinion in *State v. Byrnes,* 433 A.2d 658, 661–62 & notes 1–8 inclusive (R.I.1981). It would be pleonastic to repeat them here.

in March of 1983. The instant proceeding ensued. Flynn has, in this application, dressed in constitutional garb seven of the eight arguments [2] which he unsuccessfully made to the state supreme court, and he presents those same questions for federal habeas review.

After effectuation of the transfer from Massachusetts and the docketing of the present application in this court, an order for delivery of transcripts and related material was entered on November 7, 1983. Following compliance with that mandate and the service of the state's answer, Flynn filed motions seeking (i) representation by a lawyer not a member of the bar of this court, and (ii) permission to proceed *in forma pauperis.* On December 7, 1983, those motions were referred pursuant to 28 U.S.C. § 636. After an evidentiary hearing, they were each rejected by a magistrate of this court on December 30, 1983. Neither denial was appealed.

### I.

Before turning to the merits of the application, the court takes cognizance of the state's assertion that, given the entry of judgment adverse to Flynn in the prior habeas proceedings on May 12, 1982, *see* text *ante,* consideration of this petition is foreclosed by the mandate of 28 U.S.C. § 2244 in that the grounds are essentially identical.[3] "Abuse of the writ" is an affirmative defense; it must be pleaded by the government. *Sanders v. United*

States, 373 U.S. 1, 10–11, 83 S.Ct. 1068, 1074–1075, 10 L.Ed.2d 148 (1963) (citing *Price v. Johnston,* 334 U.S. 266, 292, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356 (1948)). Where, as here, the defense has been put in issue, the devoir of persuasion rests with the applicant. *Price v. Johnston,* 334 U.S. at 292, 68 S.Ct. at 1063. It is true that the instant application largely replicates the earlier filing. Yet, "(f)or the first decision to be given controlling weight it must also be final on the merits." *United States ex rel. Irons v. Montanye,* 520 F.2d 646, 649 (2d Cir.1975). *Cf. Sinclair v. Blackburn,* 599 F.2d 673, 675 (5th Cir.1979) *(per curiam),* cert. *denied,* 444 U.S. 1023, 100 S.Ct. 684, 62 L.Ed.2d 656 (1980). Under this standard, the court cannot bestow preclusive effect on the petitioner's voluntary withdrawal of his earlier application, that withdrawal having specifically been made "without prejudice." The applicant has not heretofore received substantive federal review of his constitutional claims, and he is entitled to such scrutinization.

While this holding necessitates an examination of the merits of Flynn's contentions, that inquiry need not long detain the court. At the outset, it should be observed that the facts have been woven into a well-finished fabric in Justice Murray's opinion, *State v. Byrnes, supra,* and no useful purpose would be served in discussing them in a discursive fashion here. Rather, this court adopts the statement of the facts so

---

**2.** In the state appeal, it was claimed that error inhered in the trial judge's refusal to permit a codefendant (Ouimette) to adduce surrebuttal testimony. *See State v. Byrnes,* 433 A.2d at 669–70. That contention (if, indeed, it was originally made by Flynn as well) is not renewed here.

**3.** 28 U.S.C. § 2244(b) provides in relevant part:
(b) When ... after a hearing on the merits of an issue of law, a person in custody pursuant to the judgment of a State court has been denied by a court of the United States or a justice or judge of the United States release from custody or other remedy on an application for a writ of habeas corpus, a subsequent application for a writ of habeas corpus in behalf of such person need not be entertained by a court of the United States unless the

application alleges and is predicated on a factual or other ground not adjudicated on the hearing of the earlier application for the writ, and unless the·court, justice, or judge is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ. And, Rule 9(b), 28 fol. § 2254 specifies as follows:
(b) Successive petitions. A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

set forth by the Rhode Island Supreme Court, augmenting the same where the context requires by particularized reference to the trial transcript ("T").

## II.

■ Flynn asserts that the state court abridged his sixth amendment right to counsel by prohibiting defense counsel from following in kind on the heels of the state's opening statement. Although petitioner paints this argument with so broad a brush as to make it appear that a total deprivation of the right to open occurred, that is simply not the case. Contrary to the asserverations of the applicant, there was no outright denial of the opening statement prerogative even at the start of trial; rather, Judge Giannini laid down the ground rules ancillary to making an opening at that time. *E.g.*, T. 190. These rules were not constitutionally offensive in any manner. And, it is equally clear that the limitations which the trial judge placed on the efforts of Flynn's counsel to address the jury immediately after the prosecutor had made his opening statement, T. 179–190, were within his discretion. Flynn's counsel was unwilling to represent that a defense case would be put on, but sought essentially to preempt the prosecution by arguing in advance the merits (or lack thereof) of the state's evidence. This is not the function of a proper opening statement. *E.g., ABA Standards of Criminal Justice, The Defense Function,* § 4–7.4 (2d ed. 1980). Flynn's counsel, although eschewing an opening statement then, did make one, subject to no special constraints, at the conclusion of the state's case. T. 3014. There is nothing in the record which suggests any substantial prejudice to Flynn's case arising out of the deferment of his counsel's opening.

■ As the Tenth Circuit has noted, "(t)he scope and extent of the defendant's opening statement rests largely in the discretion of the trial court." *United States v. Freeman,* 514 F.2d 1184, 1192 (10th Cir. 1975). The same can logically be said as to the timing thereof. Neither the applicant nor any other litigant has a vested right to open at the precise moment, and in the exact manner, that he chooses. R.I. R. Crim.P. 26.2, which provides in part that "(i)f a defendant chooses to make an opening statement, he may do so just prior to the introduction of evidence by the State, or just prior to presenting his case," does not require a different result. The language of the rule is precatory only, and there is no warrant for a federal court to overturn the state supreme court's construction of its own procedural rule as stopping short of granting to the defense an absolute right to dictate the chrononomy of counsel's remarks. There was no error of constitutional dimension in Judge Giannini's rulings in this respect.

## III.

■ Flynn likewise challenges his in-court identification by a witness, Barbara Oliva. Flynn moved orally at trial to suppress this testimony, although his motion was, at least arguably, not timely made.[4] After an extensive *voir dire* hearing, the trial judge found that a pre-trial line-up in which Oliva had participated had been conducted in derogation of Flynn's sixth amendment rights. T. 1194–95. He barred that testimony, and then considered in detail the admissibility of Oliva's in-court identification of Flynn. In a painstaking *ora sponte* bench decision, T. 1194–1213, which foreshadowed *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), he allowed the evidence. On appeal, the state supreme court, with the benefit of the Court's opinion in *Manson,* evaluated Judge Giannini's ruling, applied the five-part *Manson* test, *id.* at 114–15, 97 S.Ct. at 2253, and held that the trial judge did not err. *State v. Byrnes,* 433 A.2d at 665. The state court's reading of *Manson* appears to comport with accepted standards. *E.g., Casiano Velez v. Schmer,* 724 F.2d 249, at 251–252 (1st Cir. 1984).

4. *See State v. Maloney,* 111 R.I. 133, 300 A.2d 259, 265 (1973).

This court, in turn, has scrutinized the relevant portions of the trial record. The testimony palpably buttresses the findings and conclusions of the state judges. In particular, the holding that the in-court identification was free of any taint associated with the earlier spotting is supported by the reasonable inferences from the evidence, and by fair application of the calculus which *Manson* demands. Having in mind the deference which must be accorded to state court determinations of historical fact, *Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981); 28 U.S.C. § 2254(d), the petitioner has not sustained his burden on this claim.

IV.

■ Flynn's contention that the trial judge unfairly restricted cross-examination of various witnesses warrants short shrift. While this court recognizes that cross-questioning of witnesses is indeed "one of the safeguards essential to a fair trial," *Alford v. United States,* 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931), and that undue abridgement of this formidable right in a state criminal prosecution has fourteenth amendment implications, *Pointer v. Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965), cross-examination is not available at the whim of the accused. The *Alford* Court was, therefore, careful to note that:

> The extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.

*Alford,* 282 U.S. at 694, 51 S.Ct. at 220. The trial judge's discretion in this respect has recently been characterized by the First Circuit as "wide." *Watkins v. Callahan,* 724 F.2d 1038, at 1044 (1st Cir.1984). ■ The state supreme court has so meticulously dissected Flynn's arguments in this regard, *State v. Byrnes,* 433 A.2d at

671–77, that this court can add little to that cogent analysis. Suffice it to say that both the trial record and the applicable law indicate plainly that no repressive curtailment took place in this respect; and that petitioner, vis-a-vis his right to interrogate the state's witnesses, received process that was due.

V.

The applicant also assigns as constitutional error that he "was not permitted to testify in his own behalf." Petition at 6. This labelling, however, distorts the record. Flynn was initially called as a witness by the codefendant Ouimette. He asserted no fifth amendment privilege. The direct examination, T. 2–890–891, quoted in full in the state supreme court's opinion, *State v. Byrnes,* 433 A.3d at 665, was a model of brevity. Flynn's counsel declined to question him on this occasion. T. 2–891. The prosecutor's cross-examination was limited, and Ouimette's counsel was not permitted to reopen direct examination. T. 2–897. Flynn's lawyer later sought to call Flynn in his own case and was blocked in this effort. T. 2–897–901.

■ The codefendants were, throughout the trial, evidently working hand-in-hand. *E.g.,* T. 3877–3878; T. 3922–3923. The trial judge had noted this phenomenon earlier in the proceedings. *E.g.,* T. 2–212–215. The state supreme court trenchantly observed that the rather curious events anent Flynn's testimony evinced "defense counsels' use of tactics in order to gain some strategic advantage." *State v. Byrnes,* 433 A.2d at 666.[5] And, the strategy backfired. Flynn had a full and fair opportunity to testify, but no counsel (including his own) went forward. Since the petitioner's attorney declined the trial judge's pointed invitation to question Flynn when he appeared on the stand at Ouimette's behest,[6] T. 2–891, it was within

---

5. That conclusion finds abundant support in the record. Indeed, counsel for Ouimette admitted that strategic considerations were at the heart of this roundelay. T. 2–901.

6. It is important to note that, throughout the protracted trial, Judge Giannini allowed counsel for the other defendants to cross-examine witnesses called by one defendant; and, in effect, to convert witnesses by presenting direct testi-

permissible bounds to refuse to accord the defendant a fresh opportunity. After all, the trial judge has broad discretion in the management of a case, criminal litigation or not. He has plenary power, subject only to review for abuse of discretion, to "determine generally the order in which parties will adduce proof." *Geders v. United States*, 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976). Even so majestic a pronouncement as the sixth amendment "does not confer the right to present testimony free from the legitimate demands of the adversarial system...." *United States v. Nobles*, 422 U.S. 225, 241, 95 S.Ct. 2160, 2171, 45 L.Ed.2d 141 (1975). And, given fundamental fairness, it is settled that a criminal defendant should be held to the trial tactics adopted by his counsel. *United States v. Richman*, 600 F.2d 286, 299 (1st Cir.1979); *United States v. Sclamo*, 578 F.2d 888, 892 (1st Cir.1978). Flynn's grievance in this regard is better addressed to the battery of high-powered defense lawyers than to the trial judge. The latter acted within his wide discretion in the ordering of proof when he frustrated the effort to recoup the perceived losses flowing from gamesmanship gone astray and, in the process, to recall Flynn to the stand. After all, the instant replay is far better suited to the television screen than to the courtroom.

As the First Circuit has recently remarked in a different context, Flynn "had one bite of the apple, and the choice of the bite was [his]. Having made [his] choice, [he is] bound by the results." *Gonsalves v. Alpine Country Club*, 727 F.2d 27, at 29, (1st Cir. 1984). Though the resultant fruit may have been bitter, it was constitutionally digestible.

## VI.

■ Flynn's complaint that prosecutorial misconduct deprived him of a fair trial is bootless. The transcript, *e.g.*, T. 3572–3578, T. 3688–3691, fully bears out the reasonableness of Judge Giannini's handling of the events attendant upon the mid-trial burglarization of the quarters of the sequestered jury, *State v. Byrnes*, 433 A.2d at 667–68, and there is no substantial basis for a claim that police involvement at that time prejudiced the jury or interfered with the fairness of the trial. The incident involving the witness Floody, *id.* at 668–670, concerned Ouimette, and in no material way impacted upon Flynn. The final episode cited, referable to the witness. Robert Dussault, *id.* at 670, was treated in essentially the manner subsequently prescribed by the Court in *United States v. Morrison*, 449 U.S. 361, 365–66, 101 S.Ct. 665, 668–69, 66 L.Ed.2d 564 (1981). Dussault, ostensibly a member of the gang which engineered the break, was arrested in Nevada early in 1976. While there, a detective told Dussault on January 3, 1976 of his belief that Flynn had been killed. The report of Flynn's death was, of course, exaggerated. The rumor had originated with the Federal Bureau of Investigation, which had passed it on as fact to Detective Giblin and to Sergeant Mancuso of the Rhode Island State Police. Giblin, unaware of the truth, informed Dussault. The defense argues that the misinformation had an unconstitutionally coercive influence upon Dussault, who subsequently turned state's evidence. Judge Giannini made particularized factual findings (T. 2887–2895) that the law enforcement personnel acted in good faith, and that the information imparted to Dussault (*e.g.*, T. 2837–2839), while incorrect, was neither intended to deceive nor purposefully false. These findings were accepted by the highest court of the state. *State v. Byrnes*, 433 A.2d at 670. They flow rationally from the evidence. The petitioner points to no valid basis for a contrary conclusion.[7]

mony in that posture of events so as to minimize the delay inherent in the recalling of witnesses. *E.g.*, T. 3096. *Cf.* Fed.R.Evid. 611(b). The trial judge adverted specifically to this prac-

tice in thwarting the attempt to recall Flynn. T. 2–901.

7. Even a deliberate infringement of the defendant's rights might not, given the absence of

And, as this court lately observed in a kindred context, "(p)erfervid rhetoric and arrant speculation as to putatively iniquitous motives, unfettered by a shred of hard proof, cannot serve to slide [a] case from within the carefully-fitted integument of *Morrison*." *United States v. Marrapese*, Cr. No. 83–037S, slip op. at 3 (D.R.I. Nov. 14, 1983). The state court's findings must, of course, be accorded *Sumner* deference.

There is, in the case at bar, no solid basis for a claim that due process was denied in this manner; nor does it appear that the Dussault incident, however viewed, had any effect upon the outcome of the trial. The trial judge wisely suppressed evidence as to the events and conversations of January 3, 1976. This was all that the Constitution required. *United States v. Morrison, supra; United States v. Solomon*, 679 F.2d 1246, 1250–51 (8th Cir.1982); *United States v. Sander*, 615 F.2d 215, 219 (5th Cir.), *cert. denied*, 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980). The claim that the state's conduct was so improper as to implicate Flynn's constitutional rights is simply not borne out.

## VII.

The applicant also complains of the use of armed and uniformed state troopers to augment the committing squad (charged with maintaining custody of prisoners in court and in transit) at the trial. It is Flynn's lament that, in so doing, the trial judge transmogrified the courtroom into an "armed camp." Petition at 5. In order to place this claim into proper perspective, it is necessary to explore its antecedents.

Jury selection began in the superior court on April 12, 1976. Judge Giannini was requested to exclude the policemen in question, and declined to do so. An imme-diate petition for writ of certiorari was filed with the state supreme court; that tribunal initially refused to issue the writ. *State v. Byrnes*, 116 R.I. 923, 355 A.2d 411 (1976). While empanelment was still in progress,[8] however, the state supreme court on April 27 vacated its earlier denial of certiorari, and remanded to the court below to hold an evidentiary hearing so as personally to determine "the need for their [the gendarmes'] presence." *State v. Byrnes*, 116 R.I. 925, 927, 357 A.2d 448, 449 (1976).[9] Judge Giannini proceeded to take testimony from the chief of the committing squad and from a ranking officer of the state police. T. 114–136; T. 138–161. That evidence concluded on April 30, 1976. The trial judge then took the matter under advisement. In a lengthy and detailed bench opinion delivered on May 27, T. 219–234, Judge Giannini denied the defense motion to exclude the troopers. His reasoning, and the facts underlying his holding, are adequately summarized by the appellate court. *State v. Byrnes*, 433 A.2d at 662–63.

To repeat the characterization employed by the Rhode Island Supreme Court, the circumstances of this trial were veritably "extraordinary." *Id.* at 663. And, the need for, and extent of, security measures are generally held to be within the sound discretion of the trial court. *United States v. Gambina*, 564 F.2d 22, 24 (8th Cir.1977); *United States v. Clardy*, 540 F.2d 439, 442–43 (9th Cir.), *cert. denied*, 429 U.S. 963, 97 S.Ct. 391, 50 L.Ed.2d 331 (1976); *Kennedy v. Cardwell*, 487 F.2d 101, 108–09 (6th Cir.1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). *Cf. Woodard v. Perrin*, 692 F.2d 220, 221–22 (1st Cir.1982). Even though

---

manifest prejudice, require a different result. *Morrison*, 449 U.S. at 364–66, 101 S.Ct. at 667–68; *United States v. Cincotta*, 689 F.2d 238, 244–45 (1st Cir.), *cert. denied*, 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982). *Cf. United States v. Holley*, 463 F.2d 634 (5th Cir.1972). Here, as in *Holley*, the accused seeks to convert "a minnow into a whale." *Id.* at 638.

8. Jury selection was completed on May 21, 1976. T. 173. The panel was sworn on May 26, 1976. T. 175.

9. Apparently, the state supreme court felt, upon reconsideration and with the benefit of a full transcript, that the trial judge might have impermissibly delegated his responsibility in this vein to an administrative body charged with oversight of judicial security. 357 A.2d at 448–49.

security precautions may in some measure deprive a defendant of the physical indicia of innocence, they are not *per se* prohibited; rather, the necessity for the employment of such procedures obligates the trial court

> to simultaneously discharge clashing duties.... On the one hand, it was incumbent upon the court to strive to preserve impartiality and to avoid allowing anything to undermine the defendant's presumption of innocence. On the other hand, the trial court was charged with the duty to preserve the safety of counsel, jury, witnesses, spectators—in short, everyone inside the courtroom.

*Clardy*, 540 F.2d at 442–43. Judge Giannini, called upon to juggle these competing considerations, performed the resultant balancing with care. His conclusion that, in this instance, the interests of justice required the presence of the troopers, while perhaps fairly debatable, was well within the perimeters of his discretion. *E.g., Gambina*, 564 F.2d at 24. The necessity for heightened security for this trial was manifest. As noted by the state supreme court, the *voir dire* of the venire disclosed no prejudice attributable to the presence of the police. Less totalitarian alternatives appear to have been explored and rejected on rational grounds. The security measures approved here, extreme though they may have been, did not, under the totality of the circumstances, deny due process or equal protection to the petitioner. *See Hardee v. Kuhlman*, 581 F.2d 330, 331–32 (2d Cir.1978); *United States v. Howell*, 514 F.2d 710, 714–15 (5th Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975).

### VIII.

 The petitioner's claim that he was indicted by an illegally-constituted grand jury attempts to invoke the "fair-cross-section" requirement. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *Cf. Peters v. Kiff*, 407

U.S. 493, 503–04, 92 S.Ct. 2163, 2168–69, 33 L.Ed.2d 83 (1972). The excluded group is, in this instance, docents. *See State v. Jenison*, 405 A.2d 3, 8–9 (R.I.1979). Yet, the state supreme court held that Flynn waived the right to raise this challenge by failing either to comply with R.I. R.Crim.P. 12(b) [10] or otherwise to assert such a claim prior to conviction. *State v. Byrnes*, 433 A.2d at 677–79. This is an "adequate" state procedural ground which forecloses federal habeas review on the issue—at least in Flynn's case, where the state does enforce the rule, *State v. Morin*, 422 A.2d 1255, 1256 (R.I.1980), and where not a hint of a suggestion of "cause" appears. *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977); *Francis v. Henderson*, 425 U.S. 536, 542, 96 S.Ct. 1708, 1711, 48 L.Ed.2d 149 (1976) (discussing "cause").

### IX.

While the application, as framed, conceivably posits other questions, none are substantial and none require extended discussion. All such are, by this reference, rejected.

The trial was long, arduous, and bitterly contested. Flynn and his codefendants had the effective assistance of battle-hardened counsel who pulled out all the stops. The voluminous record documents Flynn's guilt beyond any serious nullifidianism. Under all of the circumstances, the trial judge's performance was nothing short of superlative. Flynn was fairly tried and justly convicted. The grounds proffered in support of the instant application for federal habeas review are uniformly meritless. The "red flag of constitutional breach," *Dougan v. Ponte*, 727 F.2d 199, at 201 (1st Cir.1984), does not fly from these ramparts. To the contrary, Flynn has wholly failed to show that he is in custody in violation of

---

**10.** The pertinent portions of the rule are set forth in the state supreme court's opinion. *See State v. Byrnes*, 433 A.2d at 678 n. 14.

any right secured to him by the Constitution.[11]

The petition must therefore be, and it hereby is, denied and dismissed.

*So ordered.*

---

11. Although the respondent has not asserted failure to exhaust remedies in bar of this application, the court has examined Flynn's claims in light of the recent teachings of the First Circuit in *Dougan v. Ponte, supra.* As noted in the body of this memorandum, *see* text *ante,* all of Flynn's points indubitably were raised in the prior state proceedings. The query remains, however, whether the petitioner's arguments to the state supreme court were properly focused so as to bring them within "the mainstream of constitutional litigation." *Daye v. Attorney General of State of New York,* 696 F.2d 186, 194 (2d Cir.1982) (en banc). In the absence of a specific exhaustion challenge by the state, the court has *sua sponte* undertaken an independent inquiry.

While the question is close as to at least one point, *e.g.,* Part IV hereof *ante,* the court is satisfied that the applicant adequately identified his federal constitutional claims in the earlier appeal, and that the substance of Flynn's contentions in this proceeding was heretofore "fairly presented" to the state supreme court. *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3, 7 (1982) (per curiam). The *Dougan* pinnacle appears to have been scaled. And, the court therefore declines to dismiss the application on its own initiative as one containing both exhausted and unexhausted claims. *See Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).